UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYLE CHRISTOPHER ZOELLNER,<br>    Plaintiff,<br>v.<br>CITY OF ARCATA, et al.,<br>    Defendants. | Case No. 18-cv-04471-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FIFTH AMENDED COMPLAINT**<br><br>Docket No. 107 |

Plaintiff Kyle C. Zoellner filed suit against the City of Arcata ("City"), several City police officers, and several City officials. Mr. Zoellner asserts claims for, *inter alia*, unlawful arrest, malicious prosecution, and interference with petitioning rights related to his arrest and prosecution for a murder he contends he did not commit. Currently pending before the Court is Defendants' motion to dismiss the operative fifth amended complaint ("5AC"). Defendants do not attack all claims asserted in the 5AC but rather only certain claims, including the § 1983 claims against the City. Having considered the parties' briefs as well as the argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion.

### I.     FACTUAL & PROCEDURAL BACKGROUND

The instant case is based on events that took place on April 15, 2017, early in the morning. As alleged in the 5AC, Mr. Zoellner went to a residence in the City of Arcata so that he could pick up his girlfriend from a party. At the party, he was beat up by members of an African American fraternity Brothers United ("Brothers United"), including Josiah Lawson. Mr. Lawson was beat up so badly that he lost consciousness. In a separate incident at the party, Mr. Lawson was stabbed and ultimately died. At the scene, the police immediately arrested Mr. Zoellner (even

though he was semi-unconscious). Furthermore, he continued to be detained thereafter even after the police investigation showed there was no eyewitness testimony or physical evidence linking him to the stabbing. In fact, eyewitness testimony and physical evidence indicated to the contrary. *See, e.g.*, 5AC ¶ 104.

In May 2017, a preliminary hearing was held, at which time the state court dismissed the case against Mr. Zoellner based on a lack of probable cause. *See* 5AC ¶ 124. He was then released from custody. However, the police continued the investigation. According to Mr. Zoellner, the police focused solely on him as a suspect even though there were other persons who could have been involved in the stabbing, including but not limited to Mr. Lawson's girlfriend.

In February 2019, based on the recommendations from the police, the DA's Office for Humboldt County assembled a grand jury against Mr. Zoellner but, in March 2019, the grand jury declined to indict. *See* 5AC ¶¶ 129-30. The DA's Office thereafter asked the Attorney General's Office to prosecute Mr. Zoellner but the Attorney General's Office declined. *See* 5AC ¶ 131.

In addition to the allegations above, Mr. Zoellner alleges that the police made defamatory statements about him during the course of the investigation and that, in December 2020, defense counsel threatened to bring new charges against Mr. Zoellner for the death of Mr. Lawson unless he agreed to dismiss the instant action.

Based on, *inter alia*, the above allegations, Mr. Zoellner has asserted the following claims for relief:

(1) Unlawful arrest (for lack of probable cause) in violation of 42 U.S.C. § 1983 (against Chief Chapman, Det. Sgt. Dokweiler, Det. Losey, and Officers Nilsen, Arminio, and McKenzie).

(2) Malicious prosecution in violation of § 1983 (against Chief Chapman, Chief Ahearn, Det. Sgt. Dokweiler, Det. Losey, and Officers Nilsen, Arminio, and McKenzie).

(3) Deliberate indifference to serious medical need in violation of § 1983 (against Det. Sgt. Dokweiler and Officer Nilsen).

(4) "Policymaker ratification" in violation of § 1983 (against the City).

(5) Supervisory liability in violation of § 1983 (against Chief Chapman, Chief Ehle, and

1 Chief Ahearn).

2 (6) Defamation in violation of California law (against all Defendants).

3 (7) Interference with petitioning rights in violation of § 1983 (against all Defendants).

4 (8) "Policymaker ratification" in violation of § 1983 (against the City).

5 (9) Wrongful threat of criminal prosecution (against all Defendants).

## II.  DISCUSSION

### A.  Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

### B.  Count 4: "Policymaker Ratification"

In Count 4, Mr. Zoellner asserts a § 1983 claim against the City. Although not entirely clear, the § 1983 claim seems to be based on an unlawful arrest and/or malicious prosecution theory. *See, e.g.*, Opp'n at 23 (arguing that "Defendants ratified the unconstitutional arrest, charge

1   and continued pursuit of Plaintiff").

2   "[M]unicipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an
3   official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or
4   (4) a decision or act by a final policymaker." *Horton v. City of Santa Maria*, 915 F.3d 592, 602-
5   03 (9th Cir. 2019). In November 2020, this Court issued an order holding that Mr. Zoellner had
6   failed to allege either an unconstitutional policy or a failure to train. The Court also held that Mr.
7   Zoellner had failed to allege sufficient facts to support a ratification theory – *i.e.*, that the City
8   could be held liable because Chief Chapman, as the final policymaker for the City, had ratified the
9   unconstitutional conduct of a subordinate. *See* Docket No. 93 (Order at 3-4); *see also Christie v.*
10  *Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999) (holding that "[a] municipality . . . can be liable for an
11  isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions"). The
12  Court thus dismissed the § 1983 claim against the City. The Court did give Mr. Zoellner leave to
13  amend the *Monell* claim but specified that he could replead his ratification theory only. *See*
14  Docket No. 93 (Order at 4) ("[T]he Court grants the motion to dismiss the *Monell* Claim.
15  However, Mr. Zoellner shall have thirty (30) days to file an amended complaint addressing the
16  deficiencies of his *Monell* Claim *based on ratification only*.") (emphasis added).

17      1.   <u>Liabilities Theories Not Based on Ratification</u>

18  Although the Court allowed Mr. Zoellner to assert a ratification theory only, a large
19  number of allegations in the 5AC assert that the City had an unconstitutional policy or that it failed
20  to train. *See, e.g.*, 5AC ¶¶ 33, 103, 201 (unconstitutional policy); 5AC ¶¶ 143-47 (failure to train).
21  Because the Court did not permit amendment on these latter theories, the Court rejects Mr.
22  Zoellner's attempt to reinject the theories back into this litigation. Mr. Zoellner was previously
23  given multiple attempts to cure deficiencies in his pleading with respect to an unconstitutional
24  policy or failure to train.

25  At the hearing, Mr. Zoellner argued that the Court should allow him to assert a failure-to-
26  train theory because new information arose that was not previously available to him. He notes in
27  particular that a civil grand jury was convened to investigate and report on the Lawson
28  stabbing/homicide and found that the police were not "prepared to manage and investigate a large,

4

violent crime scene of the magnitude of the . . . Lawson investigation." 5AC ¶ 143. Deficiencies identified included the following: "only 9 officers made it to the scene"; "Chief Chapman[] was not present to manage the homicide scene" which "contributed to the discoordinated [sic] investigatory response"; an officer who had just been "promoted to detective on the night of the homicide investigation . . . was expected to take the lead"; there was "no one to direct the priorities of properly securing the scene, handling evidence, and identifying and detaining potential witnesses"; the police's "'decentralized dispatch system hampered communication and added delays to the emergency and law enforcement response'"; "Chief Chapman declined multiple offers" of help from "law enforcement agencies with more experience"; there was no designated Evidence Technician available, "'leading to poor execution of evidence preservation and failed chain of custody at the crime scene'"; "the officers who initially responded 'focused on life-saving procedures at the expense of crime scene management'"; and the police "'did not identify and question all potential witnesses . . . [even] after the arrival of emergency medical responders.'" 5AC ¶¶ 143, 145-47.

The problem for Mr. Zoellner is that the results of the civil grand jury inquiry were available to him back in early July 2020. *See* "Civil Grand Jury Releases Report on David Josiah Lawson Case," North Coast Journal (July 9, 2020), *available at* https://www.northcoastjournal.com/NewsBlog/archives/2020/07/09/civil-grand-jury-releases-report-on-david-josiah-lawson-case (last visited Apr. 16, 2021). At that time, the Court had (in May 2020) dismissed the *Monell* claim in which Mr. Zoellner had asserted a failure to train and gave Mr. Zoellner leave to amend. *See* Docket No. 63 (Order at 2). Mr. Zoellner could have incorporated the civil grand jury results in his third amended complaint filed on August 22, 2020, *see* Docket No. 83 (third amended complaint), but he failed to do so. The Court thus dismissed with prejudice his failure-to-train theory in November 2020. *See* Docket No. 93 (order). Given this sequence of events, Mr. Zoellner is not in a place to argue that he was unable to include allegations about the civil grand jury results until his 5AC (or rather, his fourth amended complaint which first included allegations on such).

Furthermore, even if there was no timing problem, Mr. Zoellner's failure-to-train theory

lacks substantive merit. Even if, as the civil grand jury found, there were deficiencies in, *e.g.*, securing the scene, handling evidence, and identifying and detaining potential witnesses, those deficiencies are not sufficiently causally related to Mr. Zoellner's claims in this case. The gist of Mr. Zoellner's claims is that, based on the evidence that *was* collected, there was no probable cause to arrest, detain, and prosecute him because that evidence did not link him to the stabbing/homicide. Moreover, even if there were a failure to train with a sufficient causal connection to Mr. Zoellner's claims, Mr. Zoellner still would fare no better. A failure to train in and of itself does not establish *Monell* liability. Rather, "the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). As the Supreme Court explained in *Connick v. Thompson*, 131 S. Ct. 1350 (2011), "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train"; "in a narrow range of circumstances," the unconstitutional consequences of failing to train could be "so patently obvious" that a municipality could be liable under § 1983 without proof of a pre-existing pattern of violations – these "circumstances" generally involve incidents arising from a total lack of training, not simply an assertion that a municipal employee was not trained about "the specific scenario related to the violation." *Id.* at 1360, 1363. In the instant case, Mr. Zoellner has not pled a pattern of similar constitutional violations. Nor has he made allegations that, *e.g.*, there was a total lack of training on arrests or that there was a failure to train on a matter such that it was patently obvious that an arrest without probable cause would happen.

2. <u>Ratification Theory</u>

Turning to the issue of ratification, where the Court did give Mr. Zoellner leave to amend, the Court must bear in mind that Mr. Zoellner has claimed ratification by (1) the various Chiefs of Police during the relevant period and by (2) the City officials, *i.e.*, the City Manager and City Vice Mayor. The Court addresses each in turn.

6

### a. Ratification by Chief of Police

Mr. Zoellner alleges that there were three different Chiefs of Police during the relevant period:

- Chief Chapman from April 2017 to April 2018;
- Interim Chief Ehle from April 2018 to November 2018; and
- Chief Ahearn from November 2018 to the present.

Mr. Zoellner maintains that the City should be held liable because they were the City's final policymakers and they ratified the unconstitutional conduct of a subordinate.

As an initial matter, the Court addresses the areas in which the Chiefs of Police allegedly had final policymaking authority.[1] Although it is plausible that the Chiefs had final policymaking authority with respect to arrests/detentions, Mr. Zoellner has failed to show that they could have such authority with respect to decisions to prosecute. *See, e.g.*, *Perry v. City of Indianapolis*, No. 1:11-cv-0172-RLY-TAB, 2013 U.S. Dist. LEXIS 57802, at *17 (S.D. Ind. Apr. 23, 2013) (holding that "Chief Spears was not at the apex of authority for the action in question – referring Perry for criminal prosecution" because, even if he "suggested to the Prosecutor that criminal charges be brought against Perry, this was not the final decision[;] [i]nstead, the Prosecutor conducted an investigation, a grand jury hearing was held, and an indictment was returned," and the chief "had no authority or supervision in these activities"). Indeed, the fact that one Chief (Chief Ahearn) is alleged to have *recommended* that Mr. Zoellner be recharged, *see* 5AC ¶ 227 (alleging that, in November 2018, Chief Ahearn "prepared a report recommending Plaintiff be re-charged"),

---

[1] A court decides who is a final policymaker as a question of law, *see Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (stating that "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury"), although that decision can be informed by underlying facts. *See id.* (stating that, "[r]eviewing the relevant legal materials, including state and local positive law, as well as *custom or usage having the force of law*, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority") (emphasis added); *Bouman v. Block*, 940 F.2d 1211, 1231 (9th Cir. 1991) (indicating that who is a final policymaker is not a "question purely one of law"; "the question whether the Board of Supervisors delegated to the Sheriff's Department the authority to make employment policy decisions involves unresolved issues of fact as well").

7

indicates that the Chief of Police is not a final policymaker on the decision to prosecute.[2] He did not control the prosecutor's office which decided whether to recharge. *See Christie*, 176 F.3d at 1238 (holding that a deputy prosecutor "lacked final policymaking authority to initiate or terminate prosecutions" because "[h]er decision to prosecute was constrained by policies not of her making, and she was subject to review by the municipality's authorized policymakers").

As for arrests/detentions, much of Mr. Zoellner's' ratification theory seems to rest on the Chiefs' failure to train. *See, e.g.*, Opp'n at 8-9 (arguing in support of ratification because "all three Chief[s] of Police [had] full knowledge about lack of training and expertise to investigate"). The problem for Mr. Zoellner is that this is not a ratification theory; it is ultimately a failure-to-train theory. As noted above, the Court did not allow Mr. Zoellner to assert a failure-to-train theory.

Mr. Zoellner asserts still that there was ratification by a final policymaker because the Chief of Police (whichever individual) knew that their subordinates lacked probable cause to arrest and detain and nevertheless affirmed that conduct. For this argument, the Court considers that there are, in effect, two relevant timeframes: (1) before the state court found, in May 2017, that there was a lack of probable cause, and thus dismissed the charges against Mr. Zoellner, and (2) after the state court's ruling.

Before the state court's ruling in May 2017, the only Chief of Police was Chief Chapman. Although Mr. Zoellner claims that Chief Chapman knew there was a lack of probable cause before the state court's ruling, there are no specific allegations to support that claim. *See* 5AC ¶ 211 (alleging in conclusory fashion that "Chief Chapman was fully aware that the criminal charges against Plaintiff were baseless and lacked probable cause when he made his false public statements at various times to the general public regarding Plaintiff and that the murder was racially motivated"). In fact, it seems unlikely that Chief Chapman would have an intimate knowledge of all cases in his department. Although the Lawson case involved a murder, which presumably would be a more important case, that does not necessarily mean that Chief Chapman

---

[2] This does not mean that a Chief of Police could not be held liable *himself* for malicious prosecution. This simply means that what the Chief of Police did with respect to prosecution cannot be charged to the *City*.

8

would therefore be involved in the case or keep tabs on the case. Mr. Zoellner has not even alleged that the Lawson case was a particularly high profile case such that one could reasonably infer that Chief Chapman would have an interest in keeping abreast of it.

At best, there is an allegation that Chief Chapman made a statement to the press about the case. *See* 5AC ¶ 170 (alleging that Chief Chapman stated, "'[W]e have a white male who stabbed and killed a black male – I think it's prudent and logical to look at race as an issue, and I think it absolutely is and should be a part of our investigation'"). The question is whether one can reasonably infer that, because Chief Chapman made a public statement about the case, he knew about the true facts underlying the case. *See Christie*, 176 F.3d at 1239 ("To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'"). Although it is *possible* that Chief Chapman knew about the underlying facts, that is not sufficient under *Iqbal* and *Twombly*. Mr. Zoellner must show plausibility and do so with specific allegations.

After the state court's ruling in May 2017, Chief Chapman knew, and the Chiefs of Police who followed him thereafter presumably would have known, that there was no probable cause – at least at that time – to arrest and/or detain Mr. Zoellner. Mr. Zoellner also alleges in the 5AC that, in November 2017, an investigator hired by Mr. Lawson's mother (Thomas R. Parker) "informed Chief Chapman that[] they [sic] lacked sufficient evidence to successfully prosecute [Mr. Zoellner]." 5AC ¶ 126. The question thus becomes what actions Chief Chapman or the other Chiefs took thereafter. At the very least, they continued the investigation or allowed the investigation to continue (allegedly focusing solely on Mr. Zoellner as the suspect), but that cannot be said to be improper conduct lacking probable cause because the whole point of the investigation was to find out whether there were facts that would support probable cause. Probable cause is not needed to conduct or continue an investigation.

After the state court's ruling in May 2017, there is no indication that Mr. Zoellner was ever actually arrested or detained again. Although Chief Ahearn is alleged to have recommended that Mr. Zoellner be recharged, as noted above, he does not appear to be a final policymaker on prosecution decisions.

1    Accordingly, the Court concludes that Mr. Zoellner has failed to plead a ratification theory

2    to support *Monell* liability with the Chiefs of Police as final policymakers.

3        b.  <u>Ratification by City Manager and/or City Vice Mayor</u>

4    For the City Manager (Ms. Diemer) and City Vice Mayor (Ms. Pereira), the Court also

5    begins with an assessment of the matters on which Mr. Zoellner claims final policymaking

6    authority. Did the City officials have final policymaking authority over arrests/detentions,

7    prosecutions, or both?

8    To the extent Mr. Zoellner claims that the City Manager and/or Vice Mayor are final

9    policymakers over arrests/detentions, he has not explained how that is possible if the Chief of

10   Police is *also* claimed to be the final policymaker for such. Even if all three could somehow be

11   final policymakers for arrests/detentions, it is not clear from the 5AC how the City Manager and

12   City Vice Mayor took any action that constitutes ratification of another person's conduct. Mr.

13   Zoellner suggests that they ratified each Chief of Police's conduct because they allowed the Chief

14   to remain on the job, *see* 5AC ¶¶ 144, 216, but that theory is contrary to *Christie*, where the Ninth

15   Circuit stated that "a policymaker's mere refusal to overrule a subordinate's completed act does

16   not constitute approval." *Christie*, 176 F.3d at 1239.

17   Moreover, there are no specific allegations supporting the contention that the City Manager

18   and City Vice Mayor are final policymakers with respect to prosecutions. Mr. Zoellner has simply

19   cited a handful of state and local laws that are not on point. *See, e.g.*, Arcata Mun. Code § 2107(a)

20   ("It shall be the duty of the City Manager to see that all laws and ordinances of the City are

21   enforced . . . ."); Arcata Mun. Code § 2107(c) ("With the exception of the City Attorney, it shall

22   be the duty of the City manager to appoint, remove, promote or demote the officers and employees

23   of the City of Arcata . . . ."); Arcata Mun. Code § 2020 ("The members of the City Council shall

24   elect one (1) of its members as Mayor and one (1) of its members as Vice-Mayor . . . ."); Cal.

25   Gov't Code § 36802 ("The mayor shall preside at the meetings of the council. If the mayor is

26   absent or unable to act, the mayor pro tempore shall serve until the mayor returns or is able to

27   act."). No specific facts are alleged establishing a plausible claim.

28   The Court therefore holds that Mr. Zoellner has failed to plead a ratification theory to

10

1   support *Monell* liability with the City officials as final policymakers. Based on this holding and

2   that above, the Court dismisses Count 4 against the City with prejudice.

3   C.   Count 5: Supervisory Liability

4   In Count 5, Mr. Zoellner asserts a § 1983 claim against Chief Chapman, Chief Ehle, and

5   Chief Ahearn, invoking supervisory liability.[3] In *Iqbal*, the Supreme Court noted that, in a *Bivens*

6   case (and thus in a § 1983 case as well[4]), a supervisor "may not be held liable for the

7   unconstitutional conduct of [a] subordinate[] under a theory of respondeat superior." *Iqbal*, 556

8   U.S. at 676. A supervisor can be held liable only for his or her "own individual actions." *Id.*

9   More specifically, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists

10  either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient

11  causal connection between the supervisor's wrongful conduct and the constitutional violation.'"

12  *Starr v. Bac*a, 652 F.3d 1202, 1207 (9th Cir. 2011).

> "The requisite causal connection can be established . . . by setting in motion a series of acts by others," or by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others."

18  *Id.* at 1207-08; *see also Moss v. United States Secret Serv.*, 675 F.3d 1213, 1231 (9th Cir. 2012).

19  In their motion, Defendants argue that the analysis above for *Monell* liability applies

20  equally to supervisory liability – *i.e.*, there is no viable ratification theory for *Monell* liability

21  which also dooms supervisory liability because it too is dependent on a ratification theory.

22  As a preliminary matter, it is not clear that the Court restricted the supervisory claim (as

23  opposed to the *Monell* claim) to a ratification theory. But even if the Court were to allow a

24  failure-to-train theory for the supervisory claim (contrary to its earlier ruling), Mr. Zoellner would

---

[3] Mr. Zoellner does not bring a supervisory claim against the City Manager and City Vice Mayor.

[4] *See Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (stating that, "[u]nder Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability") (internal quotation marks omitted).

11

1  not obtain any benefit.  As indicated above, Mr. Zoellner has not established in the 5AC how any

2  failure to train led to the constitutional violation.

3  In the 5AC, Mr. Zoellner alleges facts about a prior incident in which Mr. Lawson, his

4  girlfriend, and another BU member got into a fight with and beat up a neighbor.  *See* 5AC ¶ 30.

5  According to Mr. Zoellner, the police were not responsive to that incident.  *See* 5AC ¶ 32.  But

6  one prior incident is typically not enough to support a failure to train.  *Cf. Clouthier v. County of

7  Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (in discussing *Monell* liability, noting that a

8  failure to train must amount to deliberate indifference; deliberate indifference is established when

9  "the need for more or different training is so obvious, and the inadequacy so likely to result in the

10  violation of constitutional rights, that the policymakers of the city can reasonably be said to have

11  been deliberately indifferent to the need").

12  The ratification theory, therefore, is Mr. Zoellner's only chance to obtain supervisory

13  liability.  As discussed above, for the events before the state court's May 2017 ruling, Mr.

14  Zoellner could seek to hold only Chief Chapman liable.  Whether Chief Chapman could be said to

15  have ratified the unconstitutional conduct of his subordinates turns on his knowledge of the

16  underlying facts of the case.  As noted above, Mr. Zoellner has failed to make a plausible showing

17  that Chief Chapman knew of the underlying facts at the time he gave his statement to the press.

18  For the events after the state court's May 2017 ruling, Mr. Zoellner confronts a different

19  problem – specifically, that (1) he was no longer detained and (2) the Chiefs of Police could

20  therefore be held liable only if they were a part of a malicious prosecution.  After May 2017,

21  however, there was no prosecution of Mr. Zoellner.  The police continued their investigation of the

22  Lawson case and – allegedly – focused only on Mr. Zoellner.  But a continued investigation, even

23  if unwarranted, is not a *prosecution*.  Admittedly, Chief Ahearn is alleged to have recommended a

24  prosecution.  But without an actual prosecution – an initiation of legal proceedings – Mr. Zoellner

25  is without a claim.  *See, e.g.*, *Johnson v. United States*, No. 13-cv-02405-JD, 2014 U.S. Dist.

26  LEXIS 80985, at *12-13 (N.D. Cal. June 12, 2014) ("The tort of malicious prosecution is

27  necessarily predicated on a prior lawsuit commenced 'at the direction of the defendant and []

28  pursued to a legal termination.'"); *Henneberry v. City of Newark*, No. 13-cv-05238-MEJ, 2014

U.S. Dist. LEXIS 142130, at *35 n.10 (N.D. Cal. Oct. 6, 2014) ("The requirements of a malicious prosecution claim include: malice, lack of probable cause, and termination in the plaintiff's favor. Here, Plaintiff cannot assert a claim for malicious prosecution because *no charges were ever filed against him*.") (emphasis added); *cf. Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) ("Malicious prosecution actions are not limited to suits against prosecutors, but also may be 'brought against other persons who have wrongfully caused the charges to be filed.'").

The Court thus dismisses Count 5 with prejudice.

D.  Count 6: Defamation

In Count 6, Mr. Zoellner brings a defamation claim.  It is brought against all Defendants, although this is facially unjustified because the 5AC implicates misconduct by only two individual defendants – Chief Chapman and Det. Sgt. Dokweiler – which would then give rise to respondeat superior liability for the City as well.  *See Rivera v. National R.R. Passenger Corp.*, 331 F.3d 1074, 1080 (9th Cir. 2003) ("[Under California law,] [r]espondeat superior liability is triggered if the defamation occurred within the scope of the employee's employment.").

Defendants argue that, even if to Chief Chapman, Det. Sgt. Dokweiler, and the City, there should be a dismissal of the defamation claim because, as a matter of law, the statements allegedly made by the individuals are not defamatory.[5]  According to Mr. Zoellner, the following defamatory statements were made:

- "On or about April 18, 2017, Chief Chapman published to the press [the statement] that '[W]e have a white male who stabbed and killed a black male – I think it's prudent and logical to look at race as an issue, and I think it absolutely is and should be a part of our investigation.'"  5AC ¶ 257.

- On an unspecified date, Det. Sgt. Dokweiler publicly stated that "[Mr.] Zoellner took part in the fight that allegedly led to [Mr. Lawson's] death."  SAC ¶ 182.  Sgt. Dokweiler also stated: "'Numerous witnesses had detained [Mr.] Zoellner and

---

[5] The Court acknowledges Mr. Zoellner's argument that, as a procedural matter, the Court should not entertain Defendants' substantive challenge to the defamation claim.  But because Defendants could make the same challenge through, *e.g.*, a 12(c) motion, it makes little practical sense to waste party and Court resources by deferring the issue and requiring more motion practice.

13

indicated he had stabbed the victim.'" 5AC ¶¶ 259.

The Court rejects Defendants' assertion that the statement allegedly made by Chief Chapman is not defamatory. Even though Chief Chapman's statement did not "mention Plaintiff by name," Mot. at 16, it fairly implicated Mr. Zoellner. *See Church of Scientology v. Flynn*, 744 F.2d 694, 697 (9th Cir. 1984) ("Under California law, 'there is no requirement that the person defamed be mentioned by name. . . . It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff . . . [or] if the publication points to the plaintiff by description or circumstance tending to identify him.'"); *Hayes v. Facebook*, No. 19-cv-02106-TSH, 2019 U.S. Dist. LEXIS 177830, at *18 (N.D. Cal. Aug. 15, 2019) ("A defamation plaintiff 'cannot constitutionally establish liability unless he proves that the contested statements are "of and concerning" him either by name or by "clear implication."' 'In California, whether statements can be reasonably interpreted as referring to [the] plaintiff[] is a question of law for the court . . . . If there is no express reference to the plaintiff in a defamation statement, the claim will fail unless the statement refers to the plaintiff by reasonable implication.'").

Turning to Det. Sgt. Dokweiler's statements, the Court finds that the first statement – that "[Mr.] Zoellner took part in the fight that allegedly led to [Mr. Lawson's] death," SAC ¶ 182 – is not defamatory. There is no dispute that Mr. Lawson and Mr. Zoellner did get into a fight; furthermore, even though Mr. Zoellner disputes that that fight led to Mr. Lawson dying, Det. Sgt. Dokweiler used the word "allegedly." The use of that term is enough to save the officer from liability for defamation. On the second statement, however, Mr. Zoellner has the better position. Det. Sgt. Dokweiler claimed that numerous witnesses indicated that Mr. Zoellner had stabbed Mr. Lawson, a fact that Mr. Zoellner disputes. According to Mr. Zoellner, witnesses did *not* implicate him. *See, e.g.*, 5AC ¶ 73 (alleging that, "[d]espite the fact that all BU members were present and with Lawson during this entire time, they all said that 'No one saw Plaintiff stabbing Lawson. No one saw Lawson being stabbed'"); 5AC ¶ 79 (alleging that, "[a]t the scene, Paris Wright, a BU member, told officer Nilsen that he did not see a knife and he only saw[] Lawson holding on to Plaintiff's arm and he *assumed* that Plaintiff stabbed Lawson") (emphasis in original); 5AC ¶¶ 150-51 (alleging that a search warrant was supported by a false police affidavit stating that

14

witnesses saw Mr. Zoellner holding a "'silver thing' in his hand and . . . pointing it at others in a combative manner'").

Accordingly, the Court dismisses in part Mr. Zoellner's claim for defamation. The claim is dismissed as to all Defendants, except for Chief Chapman, Det. Sgt. Dokweiler, and the City. Only one statement by Det. Sgt. Dokweiler, however, is potentially defamatory.

E.  Counts 7, 8, and 9: Interference with Petitioning Rights, "Policymaker Ratification," and Wrongful Threat of Criminal Prosecution

Counts 7, 8, and 9 are all predicated on the same factual allegations. According to Mr. Zoellner, "on December 15, 2021 and December 21, 2021, Defendants' counsel on behalf of Defendants . . . threat[en]ed Plaintiff with new criminal charges for the death of [Mr.] Lawson unless he agreed to dismiss this action, and if he agreed to dismiss it, there would be no additional criminal charges." 5AC ¶ 266.

Count 7 is a § 1983 claim for interference with petitioning rights. It is asserted against all Defendants. As an initial matter, the Court rejects Defendants' contention that any statements made by defense counsel are inadmissible because they were made during a settlement conference. Federal Rule of Civil Procedure 408 provides in relevant part as follows: "Evidence of the following is not admissible – on behalf of any party – either to prove or disprove the validity or amount of a disputed claim . . . : (2) conduct or a statement made during compromise negotiations about the claim." Fed. R. Evid. 408(a). The problem for Defendants is that Rule 408 is not applicable here because defense counsel is not being charged with making a statement "during compromise negotiations about [*this* specific] claim"; rather, counsel is being charged with making a statement during compromise negotiations about *other* claims. The wrongful threat is separate from the actual arrest, detention, and prosecution *See also* Wright & Miller, 23 Fed. Prac. & Proc. Evid. § 5314 (noting that Rule 408(b) allows for the admission of evidence for "another purpose" and that "Rule 408(b) is . . . applicable when the claim is based upon some wrong that was committed in the course of the settlement discussions" – *e.g.*, "if an insurer is sued for having breached its obligations under an indemnity policy by failing to make a reasonable settlement within policy limits Rule 408 does not prevent the plaintiff from proving her case since wrongful

1   acts are not shielded simply because they took place during compromise negotiations").

2   However, Defendants fairly point out that the statements at issue were allegedly made by
3   defense counsel and not any defendant.  Mr. Zoellner fails to explain how, particularly under §
4   1983, those statements can be attributed to any defendant, whether the City or one of the
5   individual defendants.  It is not clear who, in addition to defense counsel, was actually at the
6   meeting during which defense counsel made the statement.  It is not clear whether any person
7   indicated agreement with that statement (and for the City, whether that person can be deemed a
8   final policymaker).  The fact that no defendant has since "objected" to the statement by defense
9   counsel does not by itself establish ratification.  *See Christie*, 176 F.3d at 1239 (in discussing
10  *Monell* liability, stating that "a policymaker's mere refusal to overrule a subordinate's completed
11  act does not constitute approval").  More has to be alleged in order to establish adoption by a
12  defendant.

13  The Court therefore dismisses Count 7, as well as Count 8 which is a § 1983 claim against
14  the City only based on a ratification theory.  Both § 1983 counts are dismissed with prejudice as,
15  at the hearing, Mr. Zoellner offered no explanation as to how he could amend the claims so that
16  they could be viable.  In short, amendment would be futile in stating a § 1983 claim.

17  The Court, however, reaches a different result for Count 9, which is a state law claim for
18  wrongful threat of criminal prosecution.  Although § 1983 does not provide for respondeat
19  superior liability, such liability is possible under state law.  *See Lisa M. v. Henry Mayo Newhall*
20  *Mem'l Hosp.*, 12 Cal. 4th 291, 299 (1995) (indicating that an employer can be held liable for the
21  intentional torts of its employees when "the tortious occurrence [is] 'a generally foreseeable
22  consequence of the activity'[;] [i]n this usage, . . . foreseeability 'merely means that in the context
23  of the particular enterprise an employee's conduct is not so unusual or startling that it would seem
24  unfair to include the loss resulting from it among other costs of the employer's business.'").

25  Defendants protest that a state claim is viable only where there is actual extortion – *e.g.*,
26  where the plaintiff actually capitulates to the defendant's threat by paying money to the defendant
27  and is thereby harmed.  *See Fuhrman v. Cal. Satellite Sys.*, 179 Cal. App. 3d 408, 424, 428 (1986)
28  (noting that, "[h]owever denominated (e.g., extortion, menace, duress), our Supreme Court has

recognized a cause of action for the recovery of money obtained by the wrongful threat of criminal or civil prosecution"; because plaintiff "did not pay the money demanded by defendants, plaintiff did not sustain damages cognizable in a cause of action for duress"). But *Fuhrman* did not clearly bar a claim for relief where the plaintiff did not capitulate to the threat so long as the plaintiff still sustained actual damages of some kind.

In *Fuhrman*, the plaintiff claimed actual damages in the form of attorney's fees and emotional distress. The court held that attorney's fees were as a matter of law not recoverable because "there is no agreement for the payment of fees and no applicable statutory provision for the recovery of fees." *Id.* at 426 (acknowledging that there was some "broad language" in *Brand v. Superior Court*, 37 Cal. 3d 813 (1985), suggesting that, "whenever attorney fees are incurred as a result of the defendant's tortious conduct, such fees are an economic loss and therefore recoverable as damages" but rejecting that approach and construing "such language to be limited to the factual setting of *Brandt* and the particular conduct at issue"). With respect to emotional distress, the court noted that, "[h]owever labeled, plaintiff's first cause of action [which had been labeled 'extortion'] *could be construed* as one for the recovery of damages for the severe emotional distress caused by defendants' 'outrageous' conduct. As such, it is simply a variation of the tort of intentional infliction of emotional distress," which the plaintiff had formally alleged as a cause of action later in the complaint. *Id.* at 428 (emphasis added).

*Fuhrman* thus suggests that it is not improper for this Court to construe Mr. Zoellner's claim here – though labeled as one for wrongful threat of criminal prosecution – as one for intentional infliction of emotional distress ("IIED"), so long as he is claiming emotional distress as damages. Although Mr. Zoellner's complaint here is not the model of clarity, there is enough in the 5AC to suggest emotional distress as a result of Defendants' conduct. *See, e.g.*, 5AC ¶ 155 ("As a direct and proximate result of Defendants' acts[,] Plaintiff has been forced to endure physical pain and suffering, *mental suffering and emotional distress*, was deprived of his personal liberty, and has had to incur legal expenses.") (emphasis added); 5AC ¶ 272 ("The direct and proximate result of Defendants' [extortionate] acts is that Plaintiff has been injured as set out above.").

1    The Court therefore denies the motion to dismiss the state claim for wrongful threat of
2    criminal prosecution but construes it as an IIED claim. In allowing this claim to proceed, the
3    Court makes no ruling as to whether Mr. Zoellner will be able to prove all elements of such claim.
4    *See Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991) (noting that one element of an IIED
5    claim is that the plaintiff has "suffer[ed] severe or extreme emotional distress").

### III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Specifically:

- Count 4 ("policymaker ratification") is dismissed with prejudice.
- Count 5 (supervisory liability) is dismissed with prejudice.
- Count 6 (defamation) is dismissed in part. The claim is dismissed as to all Defendants (and with prejudice), except for Chief Chapman, Det. Sgt. Dokweiler, and the City. Only one statement by Det. Sgt. Dokweiler, however, is potentially defamatory.
- Counts 7 and 8 (interference with petitioning rights and "policymaker ratification") are dismissed with prejudice.
- Count 9 (wrongful threat of criminal prosecution/IIED) is allowed to proceed at this juncture.

This order disposes of Docket No. 107.

**IT IS SO ORDERED**.

Dated: April 19, 2021

_____
EDWARD M. CHEN
United States District Judge