UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYLE CHRISTOPHER ZOELLNER,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ARCATA, et al.,<br><br>Defendants. | Case No. 18-cv-04471-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 208 |

Plaintiff Kyle C. Zoellner has filed a civil rights action against the City of Arcata and several employees of the City Police Department (including Chief Thomas Chapman, Det. Sgt. Todd Dokweiler, Sgt. Eric Losey, Officer Devin Nilsen, Officer Krystle Arminio, and Officer Jacob McKenzie). Mr. Zoellner was arrested by the City police on April 15, 2017, for the murder of Josiah Lawson. He was charged with the crime on April 19, 2017. On May 5, 2017, following a preliminary hearing, the state court dismissed the charges against Mr. Zoellner for lack of probable cause. Mr. Zoellner has asserted causes of action under both federal and state law, including but not limited to unlawful arrest and malicious prosecution. Currently pending before the Court is Defendants' motion for summary judgment.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion.

## I.    FACTUAL & PROCEDURAL BACKGROUND

A.    Timeline of Events

The evidence submitted by the parties in conjunction with the motion for summary

1  judgment reflects as follows.

2  **4/15/2017.**  Mr. Lawson was killed at a party in the City early in the morning, around 3:00

3  a.m.  He was stabbed.  The first officer to arrive at the scene was Officer Nilsen.  Soon thereafter,

4  Officer McKenzie and Officer Arminio arrived at the scene.  Officer Arminio served as the watch

5  commander at the scene.

6  Defendants have provided a copy of the MAV (mobile audio video) recording from Officer

7  Nilsen's car.  *See also* Nilsen Decl. ¶ 4 (explaining that he had an audio recorder on his lapel that

8  worked in conjunction with the in-car recording system).  The recording shows only the interior of

9  the car but still has value because of the audio.  It lasts about two hours.  Defendants' expert, Brian

10  Medeiros, prepared a report which provides an "index" to the main events on the recording.  *See*

11  Medeiros Decl., Ex. A (Rpt. at 12 *et seq.*).

12  As indicated by the recording, within minutes after arriving at the scene, Officer Nilsen put

13  Mr. Zoellner in handcuffs and in the back of his police car.  This was also about the time that

14  Officer McKenzie and Officer Arminio arrived at the scene.  *See* McKenzie Decl. ¶ 4 ("Upon

15  arrival, I saw Nilsen with a handcuffed Plaintiff Kyle Zoellner standing outside Nilsen's patrol

16  car."); Arminio Decl. ¶ 4 ("Upon arrival, I saw Nilsen walking a handcuffed Plaintiff Kyle

17  Zoellner to his patrol car.").

18  After Mr. Zoellner was put in the police car, he stayed there for close to two hours before

19  he was taken to the hospital for injuries he had sustained during one or two fights involving Mr.

20  Lawson.  During the time Mr. Zoellner was waiting in the police car, the police did some

21  additional investigation, although Mr. Zoellner contends that the investigation was not adequate.

22  At one point during the wait (about an hour and twenty minutes into the recording), Officer Nilsen

23  spoke to someone on the phone.  During this conversation, Officer Nilsen noted that he could not

24  remember whether a witness, Mr. Wright, said he *saw* Mr. Zoellner stab Mr. Lawson or simply

25  made an *assumption* that Mr. Zoellner had stabbed Mr. Lawson.  It is not clear to whom Officer

26  Nilsen was speaking.  According to Mr. Zoellner, Officer Nilsen was speaking to Officer Arminio

27  and/or Det. Sgt. Dokweiler.

28  After Mr. Zoellner was taken to the hospital and medically cleared, he was taken to the

United States District Court
Northern District of California

United States District Court
Northern District of California

Police Department where Det. Sgt. Dokweiler interviewed him.  *See* Dokweiler Decl. ¶ 7.  Det Sgt. Dokwiler had been assigned to lead the investigation of the homicide.  *See* Dokweiler Decl. ¶ 3.

Officer Nilsen prepared a police report related to the events that same day.  *See* Zareh Decl., Exs. 3, 6 (police report).  In his report, Officer Nilsen noted, *inter alia*, as follows.

- Officer Nilsen was dispatched to the residence where the party was being held "in regards to a subject stabbed after a fight."  Zareh Decl., Ex. 3 (Rpt. at 19).

- When he arrived, there were about 100 people in the driveway area, with about 15-20 people actively fighting or pushing each other in the driveway.  As he exited the police car, a number of people fled.  Officer Nilsen radioed for additional officers to assist with the crowd.  *See* Zareh Decl., Ex. 3 (Rpt. at 19).

- Officer Nilsen walked into the area, and several people pointed to a person on a grassy area on the side of the driveway.  "Numerous subjects stated that the male was the suspect in the stabbing.  The male was later identified as Kyle Zoellner.  Zoellner was being held up by several females.  Zoellner appeared dazed."  Zareh Decl., Ex. 3 (Rpt. at 19).[1]

---

[1] At the preliminary hearing before the state court, Officer Nilsen provided testimony consistent with his police report.

> Q.    When you first arrived to the scene, what did you do?
>
> A.    I exited my patrol car and was asking where the person that was stabbed [was] located.  And as I made my way through the – the crowd, several people pointed out that there was – [the] subject that had stabbed the victim was still on scene.
>
> . . . .
>
> Q.    And what did you do next?
>
> A.    I went to where people were pointing at the suspect.
>
> Q.    And what did you see when you arrived to where they reported –
>
> A.    I saw a – the – Mr. Zoellner kinda swaying, being held up by two females.

United States District Court
Northern District of California

- Officer Nilsen saw that Mr. Zoellner "had a swollen right eye," that blood was emitting from below his eye and from his nose and mouth, and that his pants "were blood soaked around the knee areas of both pant legs." Zareh Decl., Ex. 3 (Rpt. at 19). Officer Nilsen put Mr. Zoellner in handcuffs behind his back and then placed him in the back of the police car while Officer Nilsen "began to look for witnesses." Zareh Decl., Ex. 3 (Rpt. at 19).

- Officer Nilsen interviewed several witnesses, including Mr. Wright (a member of the same fraternity as Mr. Lawson), Ms. Ortega (Mr. Zoellner's girlfriend), Ms. Wilkins (one of the women who attended the party with Mr. Zoellner's girlfriend), and Ms. McFarland (another woman who attended the party with Mr. Zoellner's girlfriend).[2] *See* Zareh Decl., Ex. 3 (Rpt. at 19); Zareh Decl., Ex. 6 (Rpt. at 21).

- Mr. Wright told Officer Nilsen that he walked by Mr. Zoellner and Mr. Lawson fighting and "observed that [Mr. Lawson] wasn't 'stabbed.' He then saw Lawson bleeding and 'assumed' that [Mr.] Zoellner had stabbed [Mr.] Lawson due to them fighting."[3] Zareh Decl., Ex. 3 (Rpt. at 19). Mr. Wright confirmed that he did not actually observe any stabbing of Mr. Lawson; also, he did not see any knife. *See* Zareh Decl., Ex. 3 (Rpt. at 19). Officer Nilsen had to stop the interview with Mr. Wright because the crowd was "being aggressive." Zareh Decl., Ex. 3 (Rpt. at 19). When Officer Nilsen tried to find Mr. Wright later, he was not able to find Mr.

_____

Pl.'s RJN, Ex. 8 (Tr. at 803-04).

At the hearing on the summary judgment motion, Mr. Zoellner argued that people only directed Officer Nilsen to him because Officer Nilsen was looking for the *victim*, not the suspect, and he (Mr. Zoellner) was the victim, having been beaten up. However, the portion of the preliminary hearing transcript on which Mr. Zoellner relies does not support his contention. *See* Pl.'s RJN, Ex. 8 (Tr. at 816) (Officer Nilsen testifying that he "was trying to find the victim" when he arrived, that he was not worried about the huge crowd of people, and that he saw Mr. Zoellner "[p]robably 15 seconds after I arrived on scene").

[2] It appears that Officer Arminio interviewed Mr. Lawson's girlfriend, Ms. Bobadilla, although apparently later at the hospital where Mr. Lawson had been taken. *See* Zareh Decl., Ex. 8 (Rpt. at 40).

[3] It appears that Mr. Wright was talking to Officer Nilsen at about 7:30 in the MAV recording.

Wright.  *See* Zareh Decl., Ex. 3 (Rpt. at 19).

- Ms. Wilkins was "visibly upset."  Zareh Decl., Ex. 3 (Rpt. at 19).  Officer Nilsen was not able to obtain a statement from her but she "later stated that she spoke with another officer."  Zareh Decl., Ex. 3 (Rpt. at 19).

- Ms. McFarland said she saw the stabbing but it happened so fast that she could not tell what exactly took place.  She stated that one of the people involved in the altercation was "a black male adult with a red shirt with blue jeans."  Zareh Decl., Ex. 6 (Rpt. at 21).

- Ms. Ortega stated that she did not see the stabbing but that Mr. Zoellner did not have a knife.  *See* Zareh Decl., Ex. 6 (Rpt. at 21).

- During the interview of Ms. Ortega, several people stated that they saw "one of the subjects involved in the altercation in a white Kia Forte that was driving by the scene.  [Officer Nilsen] had Officer K. Arminio attempt to locate the vehicle to no avail."  Zareh Decl., Ex. 6 (Rpt. at 21).

- With Mr. Zoellner's consent, Officer Nilsen conducted a BAC test on Mr. Zoellner, using a breathalyzer.  "The test resulted in 0.00 BAC."  Zareh Decl., Ex. 6 (Rpt. at 21).

- Officer Nilsen took digital photos of Mr. Zoellner's injuries and his clothing.  *See* Zareh Decl., Ex. 6 (Rpt. at 21).

- Officer Nilsen advised Mr. Zoellner that he was under arrest and then took Mr. Zoellner to the hospital for medical treatment.  After he was medically cleared, Officer Nilsen took him to the Police Department, as directed by Det. Sgt. Dokweiler.  *See* Zareh Decl., Ex. 6 (Rpt. at 21).

**4/16/2017.**  The day after the homicide, Det. Sgt. Dokweiler prepared a probable cause statement which was "necessary to book [Mr.] Zoellner into county jail.  The information [he] put in the statement came from speaking to Officers Arminio and Nilsen."  Dokweiler Decl. ¶ 8.  The statement is very short, simply noting as follows: "Officers responded to the report of a stabbing @ 1120 Spear Ave.  Numerous witnesses had detained Zoellner and indicated he had stabbed the

(v).  The (v) was transported to MRCH [*i.e.*, the hospital] and pronounced dead.  Zoellner admitted he was involved in a physical fight w/ the victim."  Docket No. 201-8 (probable cause statement).  A state court judge signed the statement of probable cause for an arrest without a warrant, and Mr. Zoellner stayed in custody based on the warrant that the judge signed until the DA charged him with murder on 4/19/2017.  *See* Dokweiler Decl. ¶¶ 8, 11.

**4/17/2017.**  The Police Department interviewed additional witnesses, including but not limited to Mr. Martinez who had been one of the attendees at the party.  *See* Zareh Decl., Exs. 2, 5 (police report, dated 4/19/2017); Zareh Decl., Ex. 8 (charging summary).  Det. Losey was the officer who interviewed Mr. Martinez.[4]  As noted below, Det. Losey later prepared a report discussing his interview of Mr. Martinez – stating, *inter alia*, in that report that Mr. Martinez "saw Zoellner stab Lawson."  Zareh Decl., Ex. 9 Rpt. at 77.

On the same day as the Martinez interview, Det. Sgt. Dokweiler and Det. Losey had a meeting with the D.A.'s Office.  *See* Dokweiler Decl. ¶ 9.  According to Det. St. Dokweiler, "[a]fter meeting with the DA's Office, [he] was under the impression the DA would not be bringing charges against [Mr. Zoellner]," and he "believed the DA wanted additional investigation to be done."  Dokweiler Decl. ¶ 10.  Det. Losey expressed the same sentiment.  *See also* Losey Decl. ¶ 8 ("I did not expect the District Attorney would bring charges against Plaintiff without further investigation.").

The detectives do not state in their declarations whether they recommended to the D.A.'s Office that charges be filed.  According to Mr. Zoellner, they did.  In support, he cites a 2018 report that was prepared by the National Police Foundation ("NPF") at the behest of the City.  *See* Pl.'s RJN, Ex. 16 (document titled "Independent Review of the Police Response to the Homicide of David Josiah Lawson") (at page 37, stating that "critical functional piece of command and management oversight was not conducted during the early weeks of the investigation, nor before

---

[4] At the hearing on the summary judgment motion, Mr. Zoellner asserted for the first time that Det. Sgt. Dokweiler was present during a part of the interview that Det. Losey conducted.  But nothing in the record supports this assertion.  For example, in the charging summary, Deg. Sgt. Dokweiler does not indicate that he was present and states that Det. Losey conducted the interview.  *See* Zareh Decl., Ex. 8 (page 42 of the charging summary).  Similarly, in his report, Det. Losey does not mention Det. Sgt. Dokweiler being present.  *See* Zareh Decl., Ex. 9.

United States District Court
Northern District of California

the case was presented to the HCDA Office *recommending charges be filed*") (emphasis added). Mr. Zoellner also points out that, in the same 2018 report, the NPF indicated that the interview of Mr. Martinez was "significant in the District Attorney's decision to file the charges in the early stages of the investigation before all the analysis and reports were completed," but that that interview (as discussed below) "was reported inaccurately."  Pl.'s RJN, Ex. 16 (page 35 of the report).

Defendants have objected to the Court taking judicial notice of the National Police Foundation report.  *See* Docket No. 229 (objections).  Defendants are correct that the Court cannot take judicial notice of the document under Federal Rule of Evidence 201; however, Defendants have not shown that Mr. Zoellner would not be able to present the document "in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(a)(2).  On the other hand, based on the NPF report alone, it cannot reasonably be inferred that the police recommended that charges be filed or that the interview of Mr. Martinez was a significant factor in the decision to charge.  Mr. Zoellner has not provided any evidence as to the factual basis for the statements made by the NPF in its report. For example, the report notes that people were interviewed but does not provide any insight as to whom.  *See, e.g.*, Pl.'s RJN, Ex. 16 (at page 8 of the report, simply stating that the National Police Foundation "conducted 24 in-depth in-person and phone interviews with non-involved parties who had knowledge of the case").  Accordingly, the NPF report, as a practical matter, is of limited evidentiary value.

**4/18/2017.**  A newspaper article, titled "APD Seeks 'Valuable' Witness to Fatal Stabbing, Release More Information," was published in the North Coast Journal of Politics.  *See* Zareh Decl., Ex. 11 (article).  The article noted, *inter alia*, that Mr. Zoellner had "been arrested on suspicion of committing Lawson's murder"; that Chief Chapman "said investigators believe the stabbing came during a fistfight between 'multiple parties,' including Zoellner and Lawson"; and that Chief Chapman stated, "'We have a white male who stabbed and killed a black male – I think it's prudent and logical to look at race as an issue, and I think it absolutely is and should be a part of our investigation.'"  Zareh Decl., Ex. 11.

**4/19/2017.**  The DA's Office brought charges against Mr. Zoellner.  *See* Dokweiler Decl. ¶

1    11; Losey Decl. ¶ 8.

2    **4/21/2017.** Det. Sgt. Dokweiler prepared a charging summary which "contained a report

3    of [his] findings to date. . . . The charging summary was sent to the District Attorney's office by

4    the Arcata Police records department." Dokweiler Decl. ¶ 12; *see also* Zareh Decl., Ex. 8

5    (charging summary). In the summary, Det. Sgt. Dokweiler noted that Det. Losey had interviewed

6    Mr. Martinez on 4/17/2017.

> Martinez stated that he was approaching the party residence when he
> observed the altercation. Martinez said that he approached and
> observed two males in the grassy area on the west side of the long
> driveway. He stated that he noticed that they were facing each other
> and in an argument. Martinez believed this because of the way they
> stood facing each other. He stated that he did not hear any yelling or
> loud voices and did not see any physical altercation. He also stated
> that the two subjects were alone, that there was no one nearby.
>
> Martinez then heard an unknown person yell that someone had a
> knife. He looked and saw one of the two subjects holding a knife in
> his right hand. He saw the one subject stab the other twice with the
> knife. Martinez was unable to describe the knife. He then saw the
> subject who was stabbed run across the long driveway and dive into
> the bushes on the east side. Martinez "lost track" of the subject who
> did the stabbing.
>
> Martinez contacted Bobadilla at the front of the residence before
> going to check on the subject in the bushes, who turned out to be
> Lawson. Martinez was unable to account for the large amount of
> blood pooled on the west side of the driveway.[5]

18   Zareh Decl., Ex. 8 (Rpt. at 42). Det. Sgt. Dokweiler also stated:

> During the entirety of the altercations, Jason Martinez is the only
> witness that states he sees Zoellner with a knife and stabbing
> Lawson. Elijah Chandler and Keandry Clark both say they saw the
> suspect holding something in his hand immediately after Lawson is
> stabbed, but neither are able to say with certainty what the item held
> by Zoellner actually is.

23   Zareh Decl., Ex. 8 (Rpt. at 43-44). According to Det. Sgt. Dokweiler:

> Based on the witness statements that Lawson was fighting solely
> with Zoellner at the time he was stabbed, witness statements that
> Zoellner was holding an object in his hand that appeared consistent

---

[5] Implicitly, the point here was that a blood pool was found on the driveway and not in the grassy area where Mr. Zoellner and Mr. Lawson were fighting. In other words, if Mr. Lawson were stabbed by Mr. Zoellner during the fight in the grass, then the blood pool should have been there and not the driveway.

United States District Court
Northern District of California

> with a knife, the physical evidence located the scene, the physical evidence obtained during the autopsy performed on Lawson indicating he died as a result of the stab wounds he received, I believe probable cause exists to believe Zoellner committed the crime of homicide.

Zareh Decl., Ex. 8 (Rpt. at 44).

**4/27/2017.** Det. Losey prepared his own police report regarding his interview of Mr. Martinez on 4/17/2017. *See* Zareh Decl., Ex. 9 (police report). Apparently, the interview was conducted in two parts and was recorded. Det. Losey recounted the first part of the interview as follows:

> [Martinez] had left the party briefly to "take a friend home." Martinez stated that he was returning to the residence, walking north on the driveway, when he heard someone say, "Oh, he has a knife." Martinez looked to the west near the "grassy area" where he saw two male adults arguing. He stated that he did not see anyone else around. Martinez stated that he believed them to be arguing but they were not yelling or striking one another.

> Martinez stated that, when he looked, he saw Zoellner stab Lawson. He stated that Zoellner held the knife in his right hand but he was unable to describe the knife. Martinez stated that he believed Zoellner struck Lawson with the knife once in the lower chest and once slightly higher. Martinez then saw Lawson run eastbound across the driveway and "jump into the bush, and he falls face down."

Zareh Decl., Ex. 9 (Rpt. at 77). Det. Losey described the second part of the interview (wherein the interview of Mr. Martinez was recorded) as follows:

> [Martinez] was walking north down the long driveway toward the residence when he noticed "two dudes on the grass, just discussing, arguing." Martinez stated that these "two dudes" were alone, "outside of the three girls." When I clarified, he stated that these "three girls" were near the residence.

> Martinez stated that he could not hear what the two subjects were saying, but that he knew they were arguing because they were standing aggressively "looking like they were arguing." Martinez stated that he did not hear any loud voices or name calling. Then Martinez heard someone say, "oh he has a knife." Martinez stated that he was standing at approximately half the length of the driveway at this point. Martinez looked at the two subjects in the grassy area and saw one subject "take out the knife" and "it was in his right hand." Martinez stated that he was facing east. Martinez was unable to further elaborate on how the subject "took out" the knife. Martinez then observed the subject stab Lawson with the knife, first in a lower location, then at a higher location.

. . . .

. . . . I also mentioned that there was a significant pool of blood located in the middle of the driveway, but Martinez was unable to say how that blood pool came to be there.

Zareh Decl., Ex. 9 (Rpt. at 77).

In a declaration filed in conjunction with the pending motion, Det. Losey states:

6. My written report mistakenly stated that Martinez identified Plaintiff by name as the person who stabbed Lawson. After I reviewed the audio recorded interview, I realized Martinez did not specifically identify Plaintiff by name – he indicated with his hand that Plaintiff stabbed the victim. I immediately informed Detective Sergeant Todd Dokweiler and the District Attorney's Office of my error. I informed the District Attorney prior to the start of Plaintiff's preliminary hearin[g] on May 1, 2017 [the exact date is not specified].

7. On May 4, 2017, I testified at Plaintiff's preliminary hearing that I made an honest error in my written report.

Losey Decl. ¶¶ 6-7; *see also* Pl.'s RJN, Ex. 10 (Prelim. Hrg. Tr. at 846-47) (Det. Losey testifying that, "regrettably, I wrote in my report that [Mr. Martinez] mentioned the name Zoellner[;] [i]n reviewing the audio file, he does not mention the name Zoellner" – so, if the report said Zoellner, there "was an error on my part"; adding that he was "using outside information [and] not what Mr. Martinez said").

**5/1/2017 to 5/5/2017.** The preliminary hearing was held (because Mr. Zoellner exercised his right to a speedy preliminary hearing). *See* Mot. at 7. At the end of the preliminary hearing, the state court judge dismissed the criminal charges for lack of probable cause. *See* Pl.'s RJN, Ex. 15 (transcript of state court's ruling at preliminary hearing). The judge did not foreclose the possibility that evidence could be developed at a later stage.[6] *See, e.g.*, Pl.'s RJN, Ex. 15 (Prelim. Hrg. Tr. at 936) ("[A]t this point, I don't believe that the evidence is sufficient to establish reasonable cause to believe that the defendant is the person who did it at this point. And I – we're 16 days after the incident took place. I assume evidence is gonna be continued to be pursued,

---

[6] In their brief, Defendants assert that evidence was, in fact, later developed that left Mr. Zoellner in the mix – *e.g.*, "DNA mixture from the knife handle indicated that there were four contributors" and "scientific analysis provided very strong support that [Mr.] Lawson and Plaintiff were contributors to this mixture. [In addition,] Lawson's blood was on the knife blade." Mot. at 8.

United States District Court
Northern District of California

analyzed.  Witnesses will be – be questioned.").  The judge found the evidence insufficient to support the criminal charges, noting that there were inconsistencies in different witnesses' versions of the events (*e.g.*, Mr. Wright and Mr. Martinez).  *See* Pl.'s RJN, Ex. 15 (Prelim. Hrg. Tr. at 930-32).  He also noted that, consistently, no witness testified that Mr. Zoellner had a knife *See* Pl.'s RJN, Ex. 15 (Prelim. Hrg. Tr. at 933).  (As noted above, in his testimony at the preliminary hearing, Det. Losey corrected the report of his interview with Mr. Martinez, clarifying that Mr. Martinez did not identify Mr. Zoellner by name.)  The judge further took into account the lack of physical evidence – including the blood pool on the driveway and the blood pool where Mr. Lawson was laying down, but no blood pool in the grassy area where the fighting was taking place.  *See* Pl.'s RJN, Ex. 15 (Prelim. Hrg. Tr. at 933-34).  In addition, the fingerprint on the knife was not Mr. Zoellner's, and the fibers on the knife "have been determined to be dissimilar from clothing that was worn by [Mr. Zoellner] that evening."  Pl.'s RJN, Ex. 15 (Prelim. Hrg. Tr. at 934).

B.      Fifth Amended Complaint

        The operative complaint is the fifth amended complaint ("5AC").  Based on the Court's prior orders, *see, e.g.*, Docket No. 131 (order), the following claims remain against the following defendants.

- **Unlawful arrest in violation of 42 U.S.C. § 1983.**
    - Officer Nilsen.
    - Officer McKenzie.
    - Officer Arminio.
    - Det. Sgt. Dokweiler.
    - Det. Losey.
    - Chief Chapman.
- **Malicious prosecution in violation of § 1983.**
    - Officer Nilsen.
    - Officer McKenzie.
    - Officer Arminio.

- o   Det. Sgt. Dokweiler.

- o   Det. Losey.

- o   Chief Chapman.

- o   Chief Ahearn.

- **Deliberate indifference to serious medical need.**

    - o   Det. Sgt. Dokweiler.

    - o   Officer Nilsen.

- **Defamation.**

    - o   City.

    - o   Chief Chapman.

    - o   Det. Sgt. Dokweiler.

- **Wrongful threat of criminal prosecution/intentional infliction of emotional distress ("IIED").**

    - o   All Defendants.

The last claim for wrongful threat of criminal prosecution/IIED has been bifurcated and stayed. *See* Docket No. 161 (minutes).  Thus, the pending summary judgment motion addresses only the first four claims above.

## II.   DISCUSSION

A.   Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

1    Where a defendant moves for summary judgment based on a claim for which the plaintiff

2    bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

3    showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

4    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Under Rule 56, a court may consider

5    evidence so long as it can "be presented in a form that would be admissible in evidence."  Fed. R.

6    Civ. P. 56(c)(2).

7    B.    Unlawful Arrest in Violation of § 1983

8    Defendants for the unlawful arrest claim are as follows:

9    • Officer Nilsen.

10   • Officer McKenzie.

11   • Officer Arminio.

12   • Det. Sgt. Dokweiler.

13   • Det. Losey.

14   • Chief Chapman.

15   Technically, the unlawful arrest claim is a claim of unlawful arrest *and* imprisonment because Mr.

16   Zoellner was arrested on April 15, 2017, and then remained in custody through April 19, 2017,

17   which was when the DA filed charges against him.[7]

18    The unlawful arrest/imprisonment claim turns on whether there was probable cause to

19   arrest Mr. Zoellner and then to continue to detain him thereafter.  *See Dubner v. City & Cnty. of*

20   *San Francisco*, 266 F.3d 959, 964 (2001) ("A claim for unlawful arrest is cognizable under section

21

22   ———————————
[7] In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court explained that,

23
         unlike the related cause of action for false arrest or imprisonment, [a
24       claim for malicious prosecution] permits damages for confinement
         imposed pursuant to legal process.  "If there is a false arrest claim,
25       damages for that claim cover the time of detention up until issuance
         of process or arraignment, but not more."  But a successful
26       malicious prosecution plaintiff may recover, in addition to general
         damages, "compensation for any arrest or imprisonment, including
27       damages for discomfort or injury to his health, or loss of time and
         deprivation of the society."
28
     *Id.* at 484.

United States District Court
Northern District of California

1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or justification."); *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (noting that, "[i]n some instances there may initially be probable cause justifying an arrest, but additional information obtained at the scene may indicate that there is less than a fair probability that the defendant has committed or is committing a crime[;] [i]n such cases, execution of the arrest or continuation of the arrest is illegal").  "In determining whether there was probable cause . . . , [a court] look[s] to 'the totality of circumstances known to the [relevant] officers, [to determine if] a prudent person would have concluded there was a *fair probability* that [the suspect] had committed a crime.'" *Crowe v. Cty. of San Diego*, 593 F.3d 841, 867 (9th Cir. 2010) (emphasis added); *see also United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (noting that fair probability does not mean "certainty or even a preponderance of the evidence").  "While conclusive evidence of guilt is . . . not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.'" *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  "'Probable cause is an objective standard[,] and the officer's subjective intention in exercising his discretion to [act] is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes.'" *United States v. Struckman*, 603 F.3d 731, 740 (9th Cir. 2010).

"[I]n a § 1983 action the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury; and summary judgment is appropriate only if *no* reasonable jury could find that the officers did or did not have probable cause to [act]." *McKenzie v. Lamb*, 738 F.2d 1005, 1007-08 (9th Cir. 1984) (emphasis added); *see also Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (stating that, "when there is no genuine issue of fact, summary judgment [in favor of the defendant] is appropriate if no reasonable jury could find an absence of probable cause under the facts").

In the pending motion, the relevant defendants argue that they are entitled to summary judgment on the unlawful arrest/imprisonment claim because it is clear Officer Nilsen had probable cause to arrest Mr. Zoellner and, implicitly, that probable cause did not thereafter dissipate during his detention prior to the preliminary hearing.  The relevant defendants also assert

14

1    qualified immunity.

2         As an initial matter, Mr. Zoellner argues that the Court cannot grant summary judgment

3    because there is a genuine dispute of material fact as to when the arrest took place:

4              Defendants allege that the arrest occurred when Nilsen placed
              Plaintiff in handcuffs as soon as he arrived at the scene.  However,
5              the evidence show the opposite.  Plaintiff was first detained.  The
              detention continued for about two hours and even then it is uncertain
6              when the arrest occurred.  Only when Plaintiff asked if he was under
              arrest two hours after detention, he was told "technically" arrested.
7              The use of the term "technically arrested" by Nilsen shows doubt
              from Nilsen as to the status of arrest.  It shows that Nilsen took
8              Plaintiff to the station as he was ordered.  Dokweiler, Losey and
              others tried to "deal with it."  As a result, this is a factual issue for
9              the jury.

10   Opp'n at 15-16; *see also United States v. Anderson*, 663 F.2d 934, 941 (9th Cir. 1981) (stating that

11   "the precise time when the lawful detention ripened into an unlawful arrest, if it did so at all, 'is a

12   question of fact which depends on an evaluation of all the surrounding circumstances'")

13        As a practical matter, this argument has no real value to Mr. Zoellner.  If Mr. Zoellner was

14   initially subject to an investigatory stop only, and not a full arrest, then the police would simply

15   need to have reasonable suspicion to detain him.  *See Thomas v. Dillard*, 818 F.3d 864, 874-75

16   (9th Cir. 2016) ("*Terry* permits limited police intrusions on a person's freedom of movement and

17   personal security when an officer's suspicion falls short of the 'probable cause' required to execute

18   an arrest or a 'full' search.  To initiate a brief stop to investigate potential criminal activity, a stop

19   that does not rise to the level of an arrest, an officer must have reasonable suspicion to believe

20   'criminal activity may be afoot' [– *i.e.*,] the officer must have reasonable suspicion 'the person

21   apprehended is committing or has committed a criminal offense.'").  That would seem to be a

22   benefit for Defendants, not Mr. Zoellner, *i.e.*, because reasonable suspicion is a more forgiving

23   standard compared to probable cause.  In any event, because Mr. Zoellner was placed in handcuffs

24   in a police car, and held for more than an hour (*i.e.*, by the time Officer Nilsen spoke to someone

25   on the phone), there can be little doubt that the detention was not a *Terry* investigative detention

26   but rather an arrest.[8]  *See generally Wash. v. Lambert*, 98 F.3d 1181 (9th Cir. 1996) (noting that

27

28   ───────────────
     [8] Presumably, Mr. Zoellner takes the position that an arrest was made only after Officer Nilsen
     consulted with someone on the phone (allegedly, either Officer Arminio or Det. Sgt. Dokweiler)

     United States District Court
     Northern District of California

15

1    "[t]here is no bright-line rule to determine when an investigatory stop becomes an arrest" and that

2    the totality of the circumstances are considered – including, *e.g.*, the extent to which liberty of

3    movement is curtailed and the type of force or authority employed).

4         A more fundamental problem with Mr. Zoellner's opposition to summary judgment is that

5    he has lumped all the relevant defendants together instead of evaluating each individual's conduct

6    separately.  Below the Court addresses the individual defendants at issue separately.

7         **Officer Nilsen.**  As an initial matter, the Court must take into account how Officer Nilsen

8    was involved in the underlying events.  Officer Nilsen was the person who arrested Mr. Zoellner.

9    He also continued to detain Mr. Zoellner up until the time that he took Mr. Zoellner to the Police

10   Department, as directed by Det. Sgt. Dokweiler.  There is no indication that Officer Nilsen

11   thereafter played any role in the investigation of the homicide.  Thus, Officer Nilsen's potential

12   liability can be based solely on his acts on 4/15/2017.

13        Officer Nilsen contends that there was probable cause to arrest and then to continue to

14   detain Mr. Zoellner because, *e.g.*, unidentified witnesses indicated Mr. Zoellner was the assailant

15   when Officer Nilsen first arrived at the scene; Mr. Zoellner's clothes were bloody; and Mr. Wright

16   (a witness) indicated that, even though he did not actually see Mr. Zoellner stab Mr. Lawson,

17   when he first passed by the two men, Mr. Lawson had not been stabbed and then, when he came

18   back soon thereafter, Mr. Lawson was bleeding (thus, Mr. Wright had a factual basis for assuming

19   that Mr. Zoellner had stabbed Mr. Lawson).

20        If these were the only facts within Officer Nilsen's knowledge, *see Devenpeck v. Alford*,

21   543 U.S. 146, 153 (2004) (noting that "an arresting officer's state of mind (*except for the facts that*

22   *he knows*) is irrelevant to the existence of probable cause") (emphasis added), then he might well

23   prevail on the claim that no reasonable jury could find a lack of probable cause.  However, it is not

24   clear from the record whether Officer Nilsen also knew that a pool of blood was found in a

25   different spot (on the driveway) from where Mr. Zoellner and Mr. Lawson were fighting (in the

26   _____

27   so that he can hold more individuals accountable for his arrest.  But that timing makes no real
     difference.  In other words, even if only Officer Nilsen was responsible for the arrest, Mr. Zoellner

28   can still argue that probable cause thereafter dissipated, with other police officers' knowledge, and
     therefore he was falsely imprisoned.

United States District Court
Northern District of California

grass).  Assuming, in Mr. Zoellner's favor, that Officer Nilsen eventually learned of this

discrepancy (*i.e.*, after he handcuffed and put Mr. Zoellner in the police car but before he turned

Mr. Zoellner over to Det. Sgt. Dokweiler), then a reasonable jury *could* find that the existence of

any probable cause to arrest/detain dissipated once he became aware of this information.  In this

regard, it is noteworthy that, at the preliminary hearing, the state court judge found a lack of

probable cause, partly because of this issue with the physical evidence.[9]

   The problem for Mr. Zoellner is that, even if a reasonable jury could find that Officer

Nilsen lacked probable cause to arrest or detain at some point during the relevant period, Officer

Nilsen asserts qualified immunity.

> The doctrine of qualified immunity protects government officials
> "from liability for civil damages insofar as their conduct does not
> violate clearly established statutory or constitutional rights of which
> a reasonable person would have known."  Qualified immunity
> balances two important interests – the need to hold public officials
> accountable when they exercise power irresponsibly and the need to
> shield officials from harassment, distraction, and liability when they
> perform their duties reasonably.

*Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).  As this Court has previously indicated, where

there is a close call on probable cause, that weighs in favor of qualified immunity.  *See Flynn v.*

*City of Santa Clara*, 388 F. Supp. 3d 1158, 1168-69 (N.D. Cal. 2019); *see also Malley v. Briggs*,

475 U.S. 335, 343 (1986) (noting that, "if officers of reasonable competence could disagree" about

the existence of probable cause, "immunity should be recognized"); *Rosenbaum v. Washoe Cty.*,

663 F.3d 1071, 1078 (9th Cir. 2011) (asking "whether all reasonable officers would agree that

there was no probable cause in this instance"); *cf. Martin v. City of San Jose*, No. 19-cv-01227-

EMC, 2020 U.S. Dist. LEXIS 185281, at *40 (N.D. Cal. Oct. 6, 2020) (noting that, "[w]hile [the

---

[9] To be clear, several of Mr. Zoellner's arguments related to probable cause do *not* have merit.
For example, contrary to what Mr. Zoellner argued at the summary judgment hearing, the
preliminary hearing transcript does not support his contention that people directed Officer Nilsen
to him because Officer Nilsen was looking for the victim and Mr. Zoellner was the victim of a
fight.  Also, although Mr. Zoellner contends that the police could have done more during the
investigation at the scene, this argument is contrary to case law holding that, "[w]hile an officer
may not ignore exculpatory evidence that would negate a finding of probable cause, [o]nce
probable cause is established, an officer is under no duty to investigate further or to look for
additional evidence which may exculpate the accused."  *Tsao v. Desert Palace, Inc.*, 698 F.3d
1128, 1147 (9th Cir. 2012) (internal quotation marks omitted).

United States District Court
Northern District of California

1   Supreme Court's decision in] *White* cautioned against finding clearly established law in the area of

2   excessive force in the absence of case law addressing similar facts, such case law is not invariably

3   required; a violation of clearly established law can be found in 'an *obvious* case'") (emphasis

4   added).

5         Here, even when evidence is viewed and all reasonable inferences are drawn in Mr.

6   Zoellner's favor, the Court cannot say that "all reasonable officers would agree" that probable

7   cause was lacking.  *Rosenbaum*, 663 F.3d at 1078.  As noted above, numerous people directed

8   Officer Nilsen to Mr. Zoellner as the assailant, and, even if the physical evidence such as the blood

9   pool could have suggested the stabbing took place separate from the fight between Mr. Zoellner

10  and Mr. Lawson, there was still bloody clothing on Mr. Zoellner.  Moreover, even though Mr.

11  Wright admitted that he had only assumed Mr. Zoellner was responsible for stabbing Mr. Lawson,

12  there was still a factual basis for his assumption given what Mr. Wright had observed.  *Cf. Fuller*

13  *v. M.G. Jewelry*, 950 F.2d 1437 (9th Cir. 1991) (finding qualified immunity where there was a

14  reasonable factual basis for a witness's claim that the defendants had stolen a ring and there was

15  some corroborating evidence).  There was no strong exculpatory evidence that would have clearly

16  undermined probable cause.[10]  Given these circumstances, it cannot be said that no reasonable

17  officer would have found probable cause to arrest Mr. Zoellner and to continue his detention

18  lacking.  Officer Nilsen is entitled to qualified immunity.

19        **Officer McKenzie.**  As above, the Court must first consider what role Officer McKenzie

20  played in the underlying events.  Officer McKenzie was the second officer on the scene.  At the

21  time he arrived, Mr. Zoellner was handcuffed and about to be put into the police car.  *See*

22  McKenzie Decl. ¶ 4 ("Upon arrival, I saw Nilsen with a handcuffed Plaintiff Kyle Zoellner

23  standing outside Nilsen's patrol car.").  Officer McKenzie seems to have been part of the

---

[10] Although Ms. Ortega stated that Mr. Zoellner did not have a knife, and Ms. McFarland identified a "black male adult with a red shirt with blue jeans" as being involved in the fight, Zareh Decl., Ex. 6 (Rpt. at 21), these pieces of evidence – while exculpatory – is of limited value because the statements were coming from Mr. Zoellner's girlfriend and her friend.  As for several people stating that they saw "one of the subjects involved in the altercation in a white Kia Forte that was driving by the scene," it appears that Officer Nilsen told Officer Arminio to try to locate the vehicle, but she was not successful.  Zareh Decl., Ex. 6 (Rpt. at 21).

United States District Court  
Northern District of California

investigation at the scene but there is no indication that he had any involvement thereafter.

Similar to above, the record is not clear as to what facts exactly were within Officer McKenzie's knowledge.  But Officer McKenzie was entitled to rely on Officer Nilsen's assessment of probable cause, at least absent additional or different knowledge on Officer McKenzie's part.  As the Ninth Circuit has underscored:

> Effective and efficient law enforcement requires cooperation and division of labor to function.  For that reason, law enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers. . . . [U]nder the "collective knowledge doctrine" probable cause may be based on "the collective knowledge of all the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom."  We emphasized that an officer "was entitled to rely on the observations and knowledge of the others, even though some of the critical information had not been communicated to him."

*Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005).  To the extent Mr. Zoellner takes the position that Officer McKenzie knew about the evidentiary problem with the blood (as with Officer Nilsen, the record is not clear on this point), that would at most raise a question of fact on probable cause.  For the reasons stated above, Officer McKenzie would still be protected by qualified immunity.

**Officer Arminio.**  Officer Arminio was the third officer on the scene and served as the watch commander there.  She arrived at the scene at or about the time when Officer Nilsen had arrested Mr. Zoellner.  *See* Arminio Decl. ¶ 4 ("Upon arrival, I saw Nilsen walking a handcuffed Plaintiff Kyle Zoellner to his patrol car.").  Similar to Officer McKenzie, there is no indication that she had involvement in the case beyond the initial investigation.

The analysis above on Officer McKenzie is largely applicable here.  She was entitled to rely on Officer Nilsen's probable cause assessment (at least absent additional or different knowledge on her part).  Moreover, people independently indicated to her that Mr. Zoellner was responsible for the stabbing which lends further support for probable cause.  *See* Arminio Decl. ¶ 5 ("Witnesses pointed [Mr.] Zoellner out to me as the suspect in the stabbing."); Arminio Decl. ¶ 7 ("I asked where the victim was, and I was pointed towards David Josiah Lawson."); Pl.'s RJN, Ex. 12 (Prelim. Hrg. Tr. at 283-84) ("People just yelling and screaming, pointing to the victim.

United States District Court
Northern District of California

1    Pointing to the suspect.  Screaming for the ambulance.  Screaming at me.").  To the extent Officer

2    Arminio knew about the evidentiary problem with the blood (which could be inferred since she

3    was the watch commander on the scene), that would at most raise a question of fact on probable

4    cause; however, she would still be entitled to qualified immunity.

5            **Det. Sgt. Dokweiler.**  Det. Sgt. Dokweiler was assigned as the lead investigator for the

6    homicide.  His participation in the investigation began the day of the murder.  Mr. Zoellner argues

7    for liability against Det. Sgt. Dokweiler for two reasons: (1) he prepared the statement of probable

8    cause (dated 4/16/2017) which stated, *inter alia*, that "[n]umerous witnesses had detained Zoellner

9    and indicated he had stabbed the (v)," Docket No. 201-8 (probable cause statement), and (2) he

10   prepared a charging summary (dated 4/21/2017) which indicated that Mr. Martinez said he saw

11   Mr. Zoellner stab Mr. Lawson.

12           On (1), the case for liability lacks merit because, similar to above, Det. Sgt. Dokweiler was

13   entitled to rely on only Officer Nilsen and Officer Arminio.  And even if Det. Sgt. Dokweiler

14   knew at the time he prepared the statement of probable cause about the evidentiary problem with

15   the blood, for the reasons stated above, he would be protected by qualified immunity.

16           As to (2), Mr. Zoellner has essentially made a claim that Det. Sgt. Dokweiler and Det.

17   Losey conspired to fabricate evidence against Mr. Zoellner.  But no reasonable jury could find a

18   conspiracy based on the record presented.  Det. Losey was the one to interview Mr. Martinez on

19   4/17/2021.  A few days later, on 4/21/2017, Det. Sgt. Dokweiler prepared the charging summary

20   in which he stated, *inter alia*, that, during Det. Losey's interview of Mr. Martinez, Mr. Martinez

21   made a statement that he saw Mr. Zoellner stab Mr. Lawson.  Det. Sgt. Dokweiler was entitled to

22   rely on Det. Losey's account of the interview (which presumably was oral in nature given that Det.

23   Losey's written report was dated 4/27/2017, *i.e.*, six days after the date of the charging summary).

24   There is nothing in the record suggesting Det. Sgt. Dokweiler had reason to doubt, at the time, the

25   accuracy of Det. Losey's account.  Nor is there any evidence that Det. Sgt. Dokweiler conspired

26   with Det. Losey to fabricate evidence against Mr. Zoellner.

27           The Court acknowledges that, as noted above, subjective motivations are generally not

28   relevant in a Fourth Amendment analysis.  *See Struckman*, 603 F.3d at 740 ("'Probable cause is an

United States District Court
Northern District of California

20

objective standard[,] and the officer's subjective intention in exercising his discretion to [act] is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes.'"). Nevertheless, the Court has considered here whether Det. Sgt. Dokweiler was part of a scheme to lie because, if he were *not* part of such a scheme, then he *would* be entitled to rely on the assessments of other officers, including Det. Losey.  Absent evidence of a scheme to lie, Det. Sgt. Dokweiler would also be protected by qualified immunity.

**Det. Losey.**  Along with Det. Sgt. Dokweiler, Det. Losey appears to have been the other main investigator assigned to the homicide.  Similar to above, Mr. Zoellner's theory is that Det. Losey played a role in the false imprisonment because he fabricated evidence about what Mr. Martinez said during the interview.  But even though Det. Losey included false evidence in his report, that does not necessarily mean probable cause was lacking to keep Mr. Zoellner in custody. The question is whether, *without* that false information, there was probable cause to continue to detain Mr. Martinez.  *Cf. Smith v. Almada*, 640 F.3d 931, 937 (9th Cir. 2011) (noting that, where a plaintiffs a false arrest claim for judicial deception, he "must show that the officer who applied for the arrest warrant 'deliberately or recklessly made false statements or omissions that were material to the finding of probable cause'" – *i.e.*, that "'the magistrate would not have issued the warrant with false information redacted, or omitted information restored'").

Because Det. Losey knew about the evidentiary problem with the blood, *see* Zareh Decl., Ex. 9 (Rpt. at 78), Mr. Zoellner has a fair argument that a reasonable jury could find Det. Losey did not have probable cause to support the continued detention.  However, as discussed above, even if a jury could reasonably find no probable cause, a reasonable officer could still conclude that there was probable cause, and therefore, Det. Losey is protected by qualified immunity.

**Chief Chapman.**  Chief Chapman was the head of the Police Department.  As with the other officers, the record is not clear on the extent of his knowledge.  However, evidence indicates that he was aware of at least some facts involved with the investigation of the homicide.  As with the other officers, Chief Chapman is entitled to summary judgment on the false arrest/imprisonment claim, either because he was entitled to rely on his subordinates and in any event is protected by qualified immunity.

1      **Summary.**  For the foregoing reasons, the Court grants summary judgment to all of the

2  named defendants on the unlawful arrest/imprisonment claim.

3  C.      Malicious Prosecution in Violation of § 1983

4      The defendants for the malicious prosecution claim are the same as the defendants for the

5  unlawful arrest/imprisonment claim, plus Chief Brian Ahearn (who succeeded Chief Chapman).

6             The elements of a malicious prosecution claim brought under § 1983
             incorporate state law.  A malicious prosecution claim in California
7             has three elements, specifically that the prosecution: (1) was
             commenced by or at the direction of the defendant and was pursued
8             to a legal termination in the plaintiff's favor; (2) was brought without
             probable cause; and (3) was initiated with malice.
9

10  *Peinado v. City & Cty. of S.F.*, No. C-11-1799 EMC, 2014 U.S. Dist. LEXIS 165843, at *11-12

11  (N.D. Cal. Nov. 26, 2014).

12      In the instant case, the Court holds that all of the defendants, except for Det. Losey, are

13  entitled to summary judgment on the malicious prosecution claim because, even if probable cause

14  was lacking (a reasonable jury could so find), no reasonable jury could find that they acted with

15  malice based on the record presented.  As noted above, although Mr. Zoellner claims that Det. Sgt.

16  Dokweiler conspired with Det. Losey to fabricate evidence, no reasonable jury could find that a

17  conspiracy existed.

18      The situation is different, however, for Det. Losey.  For Det. Losey, a genuine dispute of

19  material fact exists on malice because (1) Det. Losey included false information in his police

20  report (*i.e.*, that Mr. Martinez had identified Mr. Zoellner as the assailant), and (2) a reasonable

21  jury could infer that Det. Losey deliberately lied because of the significance of the false

22  information – *i.e.*, no other witness had claimed to see Mr. Zoellner stab Mr. Lawson (or even

23  with a knife at all).[11]

24      Det. Losey protests that he is still entitled to summary judgment because, even if there is

25  evidence to support malice and even if there were a lack of probable cause, Mr. Zoellner has failed

26  to establish a genuine dispute of material fact on causation. According to Det. Losey, it is

27

28  _____
[11] This is not to say that a reasonable jury would necessarily find malice.

United States District Court
Northern District of California

1    undisputed that he told the DA's Office about the error in his report before the preliminary hearing

2    began on 5/1/2017 but the DA's Office nevertheless decided to proceed with the preliminary

3    hearing.[12]  But Det. Losey's argument, if accepted, would simply establish that any damages

4    caused by him should be cut off once the DA's Office learned the truth and decided to prosecute

5    anyway.  *Cf. Harper v. City of Los Angeles*, 533 F.3d 1010, 1027 (9th Cir. 2008) (noting that the

6    "filing of a criminal complaint immunizes investigating officers . . . from damages *suffered*

7    *thereafter* because it is presumed that the prosecutor filing the complaint exercised independent

8    judgment in determining that probable cause for an accused's arrest exists at that time") (emphasis

9    added).  Det. Losey could still be held accountable for damages *already suffered* by Mr. Zoellner.

10        Det. Losey contends that the DA's action nonetheless undercuts any malicious prosecution

11   claim:  even if the DA believed Mr. Martinez had identified Mr. Zoellner as the assailant at the

12   time she decided to file charges, it can still be inferred that Mr. Martinez's testimony was not

13   material to her decision to file charges *because* she later went ahead with (or continued with) the

14   preliminary hearing *after* learning of the error.  Although such an inference might be made, a

15   reasonable jury need not make that inference.  Rather, a reasonable jury could still infer that Mr.

16   Martinez's testimony was material to the decision to file charges because of its significance – *i.e.*,

17   Mr. Martinez was the only witness who (as incorrectly stated in Det. Losey's report) claimed Mr.

18   Zoellner had stabbed Mr. Lawson.  At this juncture, the Court has not been presented with all the

19   factors that informed the DA's decision to proceed with the preliminary hearing.

20        Furthermore, the sequence of events could support an inference of materiality.  The record

21   does not preclude the possibility that, on 4/17/2017 when the DA's Office indicated to Det. Sgt.

22   Dokweiler and Det. Losey that it was not inclined to prosecute, it did not know about Mr.

23   Martinez's testimony.  (Mr. Martinez was interviewed on the same day as the detectives' meeting

24

---

25   [12] At the summary judgment hearing, Mr. Zoellner disputed for the first time that the DA's Office
     was told about the incorrect information before the preliminary hearing.  According to Mr.
26   Zoellner, it can reasonably be inferred from the questions the DA's Office asked Mr. Martinez at
     the preliminary hearing that it did not know about the incorrect information until Mr. Martinez
27   actually testified.  *See* Pl.'s RJN, Ex. 13 (Tr. at 585-86).  For purposes of the pending motion, it is
     not critical when exactly the DA learned of the incorrect information.  Assuming, in Mr.
28   Zoellner's favor that the DA did not know the truth until Mr. Martinez testified, the DA
     nevertheless continued with the preliminary hearing.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  with the D.A. but the record does not reflect which event took place first.)  If the DA did not know

2  at that time, then it is also possible that, subsequently, the DA learned of the testimony

3  (identifying Mr. Zoellner as the assailant) and thus decided to bring charges on 4/19.  The NPF

4  report appears to reach such a conclusion. Although the NPF report is of limited probative value

5  absent an identification of the source of the information used in the report, it tends to support the

6  inference of causation.

7  　　　　All this is to say that there are genuine disputes of material fact with respect to the

8  malicious prosecution claim against Det. Losey.  And if Det. Losey did, with malice, fabricate

9  evidence against Mr. Zoellner instead of simply making a mistake, then he would clearly not be

10  entitled to qualified immunity.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001)

11  (stating that "there is a clearly established constitutional due process right not to be subjected to

12  criminal charges on the basis of false evidence that was deliberately fabricated by the

13  government[;] [p]erhaps because the proposition is virtually self-evident, we are not aware of any

14  prior cases that have expressly recognized this specific right, but that does not mean that there is

15  no such right"); *see also Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1117 (9th Cir.

16  2009) (stating that "social workers who deliberately falsify evidence in child abuse investigations

17  cannot claim the benefit of qualified immunity"); *Lanuza v. Love*, 899 F.3d 1019, 1034 (9th Cir.

18  2017) (stating that "[t]here can be no doubt that [defendant] – who intentionally, and illegally,

19  submitted falsified evidence in an immigration hearing – is not protected by qualified immunity,

20  as the district court properly held").  Accordingly, the Court denies summary judgment on Mr.

21  Zoellner's claim of malicious prosecution against Det. Losey, but grants it as to all other

22  defendants.

23  D.　　Deliberate Indifference to Serious Medical Need in Violation of § 1983

24  　　　　Mr. Zoellner has brought a claim for deliberate indifference to serious medical need

25  against two defendants: Officer Nilsen and Det. Sgt. Dokweiler.

26  　　　　For a pretrial detainee's right to be free from deliberate indifference to serious medical

27  need, the Ninth Circuit has held that an objective standard applies. That is,

28  　　　　　　the elements of a pretrial detainee's medical care claim against an

24

> individual defendant under the due process clause of the Fourteenth
> Amendment are: (i) the defendant made an intentional decision with
> respect to the conditions under which the plaintiff was confined; (ii)
> those conditions put the plaintiff at substantial risk of suffering
> serious harm; (iii) the defendant did not take reasonable available
> measures to abate that risk, even though a reasonable official in the
> circumstances would have appreciated the high degree of risk
> involved – making the consequences of the defendant's conduct
> obvious; and (iv) by not taking such measures, the defendant caused
> the plaintiff's injuries.

*Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).  "To satisfy the third element, the

plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a

showing of 'more than negligence but less than subjective intent – something akin to reckless

disregard.'"  *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021).  *Compare Castro

v. Cty. of L.A.*, 833 F.3d 1060, 1068 (9th Cir. 2016) (noting that, under the Eighth Amendment

which applies to a claim brought by a convicted prisoner (as opposed to a pretrial detainee), an

"official must both be aware of the facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw that inference[;] [i]in other words,

the official must demonstrate a subjective awareness of the risk of harm") (internal quotation

marks and emphasis omitted).[13]

       As an initial matter, the Court notes that neither party seems to have addressed the fact that

the claim is technically brought against Det. Sgt. Dokweiler – and not just Officer Nilsen – even

though it appears that Det. Sgt. Dokweiler did not engage with Mr. Zoellner until after he had

been medically cleared.  *See* Dokwiler Decl. ¶¶ 6-7 ("I drove by the scene of the stabbing at 1120

Spear Avenue, but I did not get out and was not at the scene when it was an active crime scene.  I

did not interact with Plaintiff Kyle Zoellner prior to his arrest by Officer Devin Nilsen.  [¶] I

interviewed Plaintiff at the Arcata Police Department on April 15, 2017, after he had been

medically cleared and was under arrest.").  Because there is no argument or evidence to support

---

[13] The Ninth Circuit first held in *Gordon* – a 2018 case – that, where a pretrial detainee is
involved, a claim for deliberate indifference to serious medical need involves an objective
standard, and not an objective and subjective standard as is the case for convicted prisoners.  In the
instant case, the underlying events took place in 2017.  Nevertheless, the Ninth Circuit has held
that, in assessing whether a constitutional violation occurred, the current law on deliberate
indifference (*i.e.*, *Gordon*) applies even if the events at issue took place before *Gordon*.  *See
Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019); *Sandoval v. Cty. of San Diego*,
985 F.3d 657, 672 (9th Cir. 2021).

United States District Court
Northern District of California

1  the claim for deliberate indifference against Det. Sgt. Dokweiler, he is entitled to summary

2  judgment.

3          As for Officer Nilsen, he focuses on elements (ii)-(iv) above:

4            Plaintiff was not at substantial risk of serious harm.  Even Plaintiff

5            admitted that his injuries were not serious.[14]  [Also,] Nilsen took
          all reasonable measures to abate and reduce serious harm – he asked

6            Plaintiff if he wanted an ambulance [but Plaintiff refused]; he made
          sure to turn the heat on; he got Plaintiff water and an ice pack; he

7            checked Plaintiff's eyes to make sure he was alert.  These actions
          are objectively reasonably to deduce Nilsen was taking all

8            reasonable steps to avoid the risk of serious harm.  Finally, Plaintiff
          was medically cleared for booking, indicating that he suffered no

9            harm while in Nilsen's custody.

10  Mot. at 21; *see also* Medeiros Decl., Ex. A (Rpt. at 23-24) (going through the recording with

11  respect to interactions between Officer Nilsen and Mr. Zoellner regarding medical care).

12          However, there are arguably genuine disputes of material fact as to all three elements.  For

13  example, on element (ii), the basic question is whether the plaintiff had an apparent serious

14  medical need.  *See Melton v. Abston*, 841 F.3d 1207, 1221-22 (11th Cir. 2016) (stating that "a

15  serious medical need is considered 'one that has been diagnosed by a physician as mandating

16  treatment or one that is so obvious that even a lay person would easily recognize the necessity for

17  a doctor's attention'").  A serious medical need not be a medical need that is life threatening or

18  potentially life threatening.  *See Sandoval*, 985 F.3d at 680 (taking note of prior cases holding that

19  "it is a constitutional violation to delay treatment for four fours for inmates exposed to pepper

20  spray or to fail to promptly set a fractured thumb – neither of which are potentially life-threatening

21  conditions").  The Ninth Circuit has noted that "[e]xamples of serious medical needs include 'the

22  existence of an injury that a reasonable doctor or patient would find important and worthy of

23  comment or treatment . . . or the existence of chronic and substantial pain.'"  *Lopez v. Smith*, 203

24  F.3d 1122, 1131 (9th Cir. 2000).  The Ninth Circuit has also stated (albeit in the Eighth

25  Amendment context applicable to convicted prisoners rather than in the Fourteenth Amendment

26

27  _____

28  [14] *See* Nozzolino Decl., Ex. A (Zoellner Depo. at 253-54) (testifying about treatment he received for injuries sustained on 4/15/2017: "just like minor treatment for pain and the chipped tooth[;] [t]here was no aggressively serious injuries, thank the Lord, that I suffered").

1    context applicable to pretrial detainees) that "[a] 'serious' medical need exists if the failure to treat

2    a prisoner's condition could result in further significant injury or the 'unnecessary and wanton

3    infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other*

4    *grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

5         Some courts have held that a bleeding cut can be a serious medical need that should be

6    timely addressed.  *See, e.g.*, *Melton*, 841 F.3d at 1222 (noting that "we have found that broken

7    bones and bleeding cuts are serious medical needs that require attention within hours"); *accord*

8    *Harris v. Coweta Cty.*, 21 F.3d 388, 393-94 (11th Cir. 1994) (stating that "[d]elayed treatment for

9    injuries that are of a lesser degree of immediacy than broken bones and bleeding cuts, but that are

10   obvious serious medical needs, may also give rise to constitutional claims").  In contrast, some

11   courts have held that bruising and swelling, and even some bleeding or cuts, do not constitute a

12   serious medical need.  *See, e.g.*, *Fernandez v. Metro Dade Police Dep't*, 397 F. App'x 507, 512

13   (11th Cir. 2010) (on summary judgment motion in a Fourteenth Amendment case, concluding no

14   objectively serious medical need[;] [t]he evidence Plaintiff submitted, taken in the light most

15   favorable to him, reveals that at most he suffered a bloody nose and mouth which lasted over five

16   minutes, facial bruising, pain, disorientation, and blood clogs in his nose"); *Pinkston v. Madry*,

17   440 F.3d 879, 891 (7th Cir. 2006) (on a motion for judgment on partial findings under Rule 52(c)

18   in an Eighth Amendment case, stating that "a split lip and a swollen cheek . . . do not rise to the

19   level of an objectively serious medical need"; citing to a prior case holding that "a one-inch

20   laceration to an arrestee's temple, that was neither deep enough or long enough to require stitches,

21   and a scraped elbow did not require prompt medical attention under the Eighth Amendment");

22   *White v. Lindbergh*, No. 12-cv-0769-MJR-SCW, 2015 U.S. Dist. LEXIS 6114, at *12 (S.D. Ill.

23   Jan. 20, 2015) (on summary judgment motion in an Eighth Amendment case, stating that "the

24   normal incidents of fighting do not rise to the level of a serious medical need" and that "[b]ruising

25   and swelling are not objectively serious"; also citing cases holding that the following are not

26   serious medical needs: a busted lip, a small cut, and abrasions on the face).

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1

In the instant case, a reasonable jury might well conclude based on the evidence of record

2

that Mr. Zoellner had an apparent serious medical need.  The picture of Mr. Zoellner after the

3

incident suggests more than simple bruising and swelling.



12

13

SAC ¶ 87.  In addition, Officer Nilsen acknowledged that, when he saw Mr. Zoellner at the scene,

14

he "was being held up by several females," "appeared dazed" and had a "swollen right eye with

15

fresh blood emitting from below the right eye socket" and "blood emitting from his nose and

16

mouth."  Zareh Decl., Ex. 3 (police report); *see also* Pl.'s RJN, Ex. 8 (Prelim. Hrg. Tr. at 804)

17

(Officer Nilsen testifying that Mr. Zoellner was "kinda swaying, being held up by two females"

18

and that he had a "swollen right eye" and "blood emitting from his nose and mouth").  *But see*

19

Zareh Decl., Ex. 17 (Nilsen Depo. at 38) (testifying that Mr. Zoellner "appeared coherent and

20

cognizant of what was going on" and that he was able to walk on his own).[15]  The fact that Mr.

21

Zoellner declined an ambulance is not dispositive.  As Mr. Zoellner points out, he may not have

22

been in the best position to assess his medical needs, and both his girlfriend and his father believed

23

he needed medical help.  *See* Opp'n at 26.

24

As for element (iii), there would also seem to be a question of fact as to whether Officer

25

Nilsen took reasonable available measures to abate risk to Mr. Zoellner.  Officer Nilsen could

26

easily have called for an ambulance or at least a family member soon after he arrested/detained

27

28

[15] This characterization is not necessarily unfair.  There are points during the recording when Mr. Zoellner sounds normal and coherent.

Mr. Zoellner.  He did neither – even though there appears to be a police policy indicating that those remedies should be pursued if EMS care is required and the person refuses care.[16]  *See* Opp'n at 25.  And when Mr. Zoellner's father spoke to Officer Nilsen on the phone (after being alerted to the situation by Mr. Zoellner's girlfriend), Officer Nilsen arguably downplayed any problems, telling the father that "Kyle's okay.  He's with me right now, hanging out until we can figure out what happened.  But he's fine.  He has a pretty good shiner."  Eric Zoellner Decl. ¶ 3.  Of course, an argument could be made that, even if Mr. Zoellner had a serious medical need, delaying treatment for some period of time was not objectively unreasonable; however, that is a factual question for the jury.

Finally, for element (iv), even if Mr. Zoellner was eventually medically cleared, that does not necessarily mean that Mr. Zoellner did not suffer any injury as a result of the delay in getting him medical treatment.  He could have, *e.g.*, suffered pain unnecessarily by not being given pain medication.  That being said, the Court takes note that Mr. Zoellner may be trying to get damages related to the fights themselves and not damages related to the delay in getting treatment.  *See* Opp'n at 26 (asserting that Mr. Zoellner "was suffering and continues to suffer from emotional distress, loss of memory, confusion, tooth issues, concussion, anxiety and constant threat to his life by others"); *see also Melton*, 841 F.3d at 1220 (noting that a plaintiff must prove "causation between [the deliberate] indifference and the plaintiff's injury").

The Court, however, need not definitively rule on the above because, even if there is a genuine dispute of material fact on various elements of the deliberate indifference claim, there is

---

[16] According to Mr. Zoellner, the Police Department has a policy (§ 467.5) on "Persons Refusing EMS Care" as follows:

> "If an officer believes that a person who is in custody requires EMS care and the person refuses, he/she should encourage the person to receive medical treatment.  The officer may also consider contacting a family member to help persuade the person to agree to treatment or be able to authorize treatment for the person.  If the person still refuses, the officer will require the person to be transported to the nearest medical facility.  In such cases the officer should consult with a supervisor prior to the transport."

Opp'n at 25.

still the matter of qualified immunity.  The Ninth Circuit has instructed that,

> when we assess qualified immunity for a claim of inadequate
> medical care of a pre-trial detainee arising out of an incident that
> took place prior to *Gordon*, we [1] apply the current objective
> deliberate indifference standard to analyze whether there *was* a
> constitutional violation, and [2] "concentrate on the objective
> aspects of the [pre-*Gordon*] constitutional standard" to evaluate
> whether the law was *clearly established*.

*Sandoval*, 985 F.3d at 672 (emphasis added).  In the case at hand, the critical question is whether

the constitutional right was clearly established at the time of the violation.  That is, would it be

clear to a reasonable officer that his conduct was unlawful in the situation confronted based on the

law at the time?  *See id.*; *see also id.* at 674 (noting that there is an objective inquiry comparing the

factual circumstances faced by the defendant to the factual circumstances of prior case "to

determine whether the decisions in the earlier cases would have made clear to the defendant that

his conduct violated on the law"; adding that "the qualified immunity analysis remains objective

even when the constitutional claim at issue involves subjective elements"); *id.*  at 678 (stating that,

under the second prong of the qualified immunity test, there is "an objective examination of

whether established case law would make clear to every reasonable official that the defendant's

conduct was unlawful in the situation he confronted").

Although neither party has sufficiently briefed the issue of what was clearly established

law at the time, *Sandoval* (a 2021 decision by the Ninth Circuit) provides some guidance.  In

*Sandoval*, the Ninth Circuit considered whether a nurse at a jail was entitled to qualified immunity

given the following facts: he was told by a deputy that the detainee (who eventually died) was

sweating, tired, and disoriented and that there was something going on that needed to be looked at

more thoroughly.  The Ninth Circuit noted that the question was

> whether every reasonable nurse would understand, in light of
> established case law, that [nurse] de Guzman violated Sandoval's
> constitutional right to adequate medical care when he responded by
> merely performing a 10-second blood sugar test – a test performed
> earlier to no avail – and then walking away, leaving Sandoval
> unattended for six hours despite the fact that he was only 20 feet
> from de Guzman's nursing station.  In light of our precedent, all
> reasonable nurses would understand that de Guzman's minimal –
> almost non-existent – course of treatment violated the Constitution.
>
> . . . .

30

. . . In *Clement v. Gomez*, we held that correctional officers could be liable for failing to provide constitutionally adequate medical care when they knew that inmates had been exposed to pepper spray but waited four hours before allowing them to leave their cells to shower. 298 F.3d 898, 902, 904-05 (9th Cir. 2002). Similarly, in *Jett v. Penner*, we held that a doctor could be held liable for a constitutional violation when he knew that an inmate's thumb was fractured but failed to ensure that the fracture was set and cast. 439 F.3d at 1097-98; *see also Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (plaintiff could establish a constitutional violation when prison officials were aware that he was suffering from bleeding gums and broken teeth as a result of broken dentures but "failed to take any action to relieve his pain or to prescribe a soft food diet until new dentures could be fitted").

The rule reflected in these decisions is clear: a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition.

To be sure, we have never before addressed the specific factual circumstances here, where a nurse is told that a patient is sweating, disoriented, and in need of a more thorough look but does nothing more than perform a quick 10-second blood test. But de Guzman is not entitled to qualified immunity simply because "the very action in question has [not] previously been held unlawful." . . .

If it is a constitutional violation to delay treatment for four hours for inmates exposed to pepper spray, *Clement*, 298 F.3d at 905, or to fail to promptly set a fractured thumb, *Jett*, 439 F.3d at 1097-98— neither of which are potentially life-threatening conditions – the same must be true for failing to provide any meaningful treatment to an inmate who was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated. Accordingly, every reasonable nurse in Nurse de Guzman's position would have understood that his treatment of Sandoval, or lack thereof, was constitutionally inadequate.

*Id.* at 679-80.

Although *Sandoval* is helpful to Mr. Zoellner in that the court denied qualified immunity in spite of there being no closely analogous case, the factual circumstances there were more extreme than those here. In *Sandoval*, the nurse was expressly told by the deputy that, even though the detainee had been medically cleared, there was something going on with him. Moreover, the nurse left the detainee unattended for six hours after administering the 10-second blood sugar test. The cases cited in *Sandoval* are also materially distinguishable because they involve more extreme circumstances. For example, in *Clement*, the prisoners were denied showers and medical attention after being pepper sprayed for four hours even though the officers themselves reacted to the

pepper spray (*e.g.*, coughing and gagging) and had to take turns to step outside to get fresh air. *See Clement v. Gomez*, 298 F.3d 898, 902 (9th Cir. 2002). In *Jett*, the prisoner was never taken to the hospital or an orthopedist until four months after the visit with the doctor (and six months after the injury). *See Jett v. Penner*, 439 F.3d 1091, 1097 (9th Cir. 2006); *cf. Alsobrook v. Alvarado*, 656 F. App'x 489, 496 (11th Cir. 2016) (noting that, in a prior case, "we held that several police officers violated the plaintiff's constitutional rights by delaying, for two and a half hours, medical treatment for a one-and-a-half-inch bleeding cut because they 'were waiting for a detective to tell them what to do'"; concluding that there was "no meaningful distinction" between that case and the case at hand" – even if the plaintiff in the earlier case needed stitches for his cut and the plaintiff in the case at bar was treated with Motrin only, that distinction was "immaterial because in both cases the plaintiff suffered wounds that bled profusely, and in both cases, the defendant or defendants left the bleeding inmate in a cell for significant periods of time"). The instant case is markedly different. There was no clear indication of an urgent medical situation. Mr. Zoellner was not coughing and gagging, nor was he bleeding profusely. And Officer Nilsen did ask Mr. Zoellner if he wanted an ambulance about 15-20 minutes after being arrested/detained.[17] Although arguably Officer Nilsen should not have accepted Mr. Zoellner's declination of an ambulance, that makes the instant case distinguishable from, *e.g.*, *Sandoval*.

It is far from clear that every reasonable officer in Officer Nilsen's position would have understood that failure to get immediate (or at least quick) medical attention for Mr. Zoellner was constitutionally inadequate. Given the lack of clarity in the case law applicable to similar facts here, Officer Nilsen is entitled to qualified immunity.

E.    Defamation

"Defamation is the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or that causes special damage." *Grenier v. Taylor*, 234 Cal.App.4th 471, 486 (2015). Based on the Court's prior order, the defamation claim (asserted against the City, Chief Chapman, and Det. Sgt. Dokweiler) was limited to the following predicate

---

[17] Officer Nilsen's inquiry takes place at about 21:00 on the recording.

acts: (1) Chief Chapman stating on 4/18/2017 to the press that "'[W]e have a white male who stabbed and killed a black male – I think it's prudent and logical to look at race as an issue, and I think it absolutely is and should be a part of our investigation,'" and (2) Det. Sgt. Dokweiler stating (on an unspecified date) that "'Numerous witnesses had detained [Mr.] Zoellner and indicated he had stabbed the victim.'"  Docket No. 131 (Order at 13-15).

        1.      Additional Predicate Acts

As an initial matter, the Court notes that, in his opposition, Mr. Zoellner has tried to expand the predicate acts to include the following: (3) a statement by Det. Sgt. Dokweiler in the 4/21/2017 charging summary that "'During the entirety of the altercations, Jason Martinez is the only witness that states he sees Zoellner with a knife and stabbing Lawson'" and (4) a statement by Det. Losey in his 4/27/2017 report that "'Martinez stated that, when he looked, he saw Zoellner stab Lawson.  He stated that Zoellner held the knife in his right hand but he was unable to describe the knife.  Martinez stated that he believed Zoellner struck Lawson with the knife once in the lower chest and once slightly higher.'"  Opp'n at 27.  The Court rejects Mr. Zoellner's attempt to expand the predicate acts.  Mr. Zoellner's delay in raising these statements as part of his defamation claim has prejudiced Defendants; they have not been able to move for summary judgment on these belated claims.

        2.      Det. Sgt. Dokweiler's Statement

With respect to Det. Sgt. Dokweiler's statement, it is now clear that Mr. Zoellner is relying on the statement that the officer made in the probable cause statement dated 4/16/2017, which was submitted to a state court judge.  *See* Opp'n at 27 (asserting that Det. Sgt. Dokweiler made the statement "to the criminal court under penalty of perjury that 'numerous witnesses had detained Zoellner and indicated he had stabbed the (v)'").

Det. Sgt. Dokweiler argues, *inter alia*, that the statement was not false; more important, now that Mr. Zoellner has identified where the statement comes from, the statement is privileged.  California Civil Code § 47(b) provides that "[a] privileged publication or broadcast is one made . . . [i]n any (1) legislative proceeding, (2) judicial proceeding, [or] (3) in any other official proceeding authorized by law."  Cal. Civ. Code § 47(b).  The police report filed here falls under §

1    47(b)(2) and/or (3).

2         *Block v. Sacramento Clinical Labs*, 131 Cal. App. 3d 386 (1982), is an instructive case.

3    There, the plaintiff's infant daughter died.  The sheriff-coroner's office investigated the cause of

4    death and submitted samples of the baby's blood to the defendant, a toxicologist.  The defendant

5    made calculations about the number of baby aspirin the baby would have had to ingest to produce

6    the high concentration of a chemical in her bloodstream.  The DA's office used his calculations for

7    filing criminal murder and child neglect charges against the plaintiff.  At the preliminary hearing,

8    it was discovered that the defendant had erred in his calculations and the criminal complaint was

9    discharged.  The plaintiff then filed suit, asserting professional negligence.  The court noted that

10   "[p]laintiff's theory of liability places [the defendant's] communication of the report to the district

11   attorney and, later, his testimony in the criminal proceeding, at the heart of the claim of liability" –

12   *i.e.*, "[t]he claimed actionable wrong is a modern form of injurious falsehood."  *Id.* at 392.

13            Having placed the tort within those made subject to a claim of
14            privilege, we next determine that the injurious falsehood was
             privileged.  [The defendant] performed and communicated the
15            calculations upon the request of the office of the district attorney in
             furtherance of its investigation whether there was probable cause to
16            initiate criminal charges relating to the infant's death.  "[When] the
             communication has some relation to a proceeding that is actually
17            contemplated in good faith and under serious consideration by . . . a
             possible party to the proceeding," the communication is privileged.
18            And, notwithstanding that the privilege is most often asserted in
             civil disputes, the privilege is applicable to "proposed litigation,
19            either civil or criminal."

20            To allow plaintiff to proceed with this action would substantially
             defeat the purpose of a privilege designed "*to afford litigants
21            freedom of access to the courts . . . and to promote the unfettered
             administration of justice* even though as an incidental result it may
22            [sometimes] provide . . . immunity to the . . . malignant slanderer
             [citations]."  "[Strong] policy reasons exist to assure free and open
23            channels of communication between citizens and public agencies
             and authorities charged with the responsibility of investigating
24            wrongdoing [citation] without which protection would effectively
             close such important channels [citation]."  "The function of
25            witnesses is of fundamental importance in the administration of
             justice.  The final judgment of the tribunal must be based upon the
26            facts as shown by their testimony, and it is necessary therefore that a
             full disclosure not be hampered by fear of private suits for
27            defamation.  The compulsory attendance of all witnesses in judicial
             proceedings makes the protection thus accorded all the more
28            necessary."

1    *Id.* at 393-94 (emphasis in original).

2        In light of *Block*, the probable cause statement prepared by Det. Sgt. Dokweiler must be

3    considered privileged.  Allowing Mr. Zoellner to proceed against Det. Sgt. Dokweiler here would

4    hamper free and open communication between law enforcement and the courts and thus defeat the

5    purpose of the privilege.

6        3.    Chief Chapman's Statement

7        As noted above, Chief Chapman's statement is one that he made to the press on 4/18/2017

8    – specifically, "'[W]e have a white male who stabbed and killed a black male – I think it's prudent

9    and logical to look at race as an issue, and I think it absolutely is and should be a part of our

10   investigation.'"

11       a.    Libel v. Slander

12       As a preliminary matter, the Court notes that the parties have a dispute as to whether the

13   alleged defamation at issue is libel (written publication) or slander (oral publication).  *See* Cal.

14   Civ. Code § 45 (defining libel); *id.* § 46 (defining slander).  Chief Chapman's statement to the

15   press itself would appear to be slander while the republication of his statement by the press would

16   be libel.  However, whether slander or libel is at issue is ultimately not that significant a matter.

17   Rather, as discussed below, a more important issue is whether there is defamation (whether

18   slander or libel) per se (*i.e.*, defamation on its face) or instead only defamation per quod.

19       Before getting to that issue, however, the Court first entertains Chief Chapman's argument

20   that he is entitled to summary judgment because his statement was true, not false (*i.e.*, at the time,

21   he believed that Mr. Zoellner had stabbed Mr. Lawson.[18]

22       b.    Falsity

23       Regarding falsity, Chief Chapman's assertion is not particularly compelling.  Opinions

24   (*i.e.*, beliefs) can be actionable.  *See Okun v. Superior Ct.*, 29 Cal. 3d 442, 451-52 (1981)

25   (indicating that "'a statement in the form of an opinion . . . is actionable only if it implies the

26

27   _____

28   [18] To the extent Mr. Zoellner's defamation claim is based on Chief Chapman's statement about race, the claim is clearly lacking in merit.  Chief Chapman did not say that the stabbing was racially motivated but rather simply indicated that it was an issue that the police would explore.

United States District Court
Northern District of California

allegation of undisclosed defamatory facts as the basis for the opinion'"); *Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1181 (2000) (noting that, "[i]f a statement of opinion implies a knowledge of facts which may lead to a defamatory conclusion, the implied facts must themselves be true[;] [e]ven if the publisher of the opinion states the facts upon which he or she bases this opinion, if those facts are either incorrect or incomplete, or if the person's assessment of them is erroneous, the statement of opinion may still imply a false assertion of fact").

That being said, there is an argument that Chief Chapman's statement was not false *when taken in context*. *See Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325, 1337 (2009) ("In determining whether a publication has a defamatory meaning, the courts apply a totality of the circumstances test to review the meaning of the language in context and whether it is susceptible of a meaning alleged by the plaintiff."). (Neither party has addressed this issue in their papers.) Chief Chapman's statement appears in an article that was published by the North Coast Journal of Politics. *See* Zareh Decl., Ex. 11 (article). The article is titled "APD Seeks 'Valuable' Witness to Fatal Stabbing, Releases More Information." The article notes, *inter alia*, that the Police Department was "continuing to urge witnesses . . . to come forward and cooperate with the investigation" and that Chief Chapman was

> especially keen on speaking with whoever sent it an anonymous email today that provide[s] a first-hand account of the stabbing. "There were some specifics (in the email) that certainly keyed for me that, if it's legitimate, we need this person to come forward," Chapman said. "They are a key eye witness and potentially a very valuable piece to this investigation."
>
> . . . .
>
> Kyle Christopher Zoellner, a 23-year-old McKinleyville man, has been arrested on suspicion of committing Lawson's murder.
>
> Chapman said investigators believe that stabbing came during a fistfight between "multiple parties," including Zoellner and Lawson. It was the second fight of the night involving Zoellner, Chapman said, though Lawson was not believed to have been involved in the first. The fights appear to have broken out surrounding accusations of a cell phone theft, Chapman said.
>
> Because Lawson was black and Zoellner is white, Chapman said APD is investigating whether any aspect of the incident may have been racially motivated, adding that the department has not made any determination at this time.

36

1

2

3

> "We have a white male who stabbed and killed a black male – I think it's prudent and logical to look at race as an issue, and I think it absolutely is and should be a part of our investigation," Chapman said.

4

5

> In addition to getting in touch with whoever sent the email earlier today, Chapman said investigators are looking to find any video footage of the altercations and stabbing that may exist.  So far, he said, they have found none.

6

7

> "Of course, that's something that would be critically crucial," he said.

8   Zareh Decl., Ex. 11.

9   Although Chief Chapman made the statement, "We have a white male who stabbed and

10  killed a black male," that statement was not made in a vacuum but rather was part of a broader

11  discussion with the press (which the press then republished) when the Chief sought to obtain

12  eyewitnesses as part of an ongoing investigation.  Given this context, Chief Chapman arguably

13  was not definitively stating that Mr. Zoellner stabbed and murdered Mr. Lawson but rather was

14  indicating that Mr. Zoellner was the suspect and that the police were trying to develop more

15  evidence in its investigation.  Nonetheless, the Court assumes falsity for purposes of this motion.

16                    c.    Standard of Fault

17  Assuming that there is a genuine dispute of material fact on the issue of falsity, the next

18  issue for the Court to consider is whether Chief Chapman made his statement negligently,

19  recklessly, or intentionally.  *See Khawar v. Globe Internat.*, 19 Cal. 4th 254, 273-74 (1998) ("The

20  First Amendment to the federal Constitution, as authoritatively construed by the United States

21  Supreme Court, does not require a private figure plaintiff to prove actual malice to recover

22  damages for actual injury caused by publication of a defamatory falsehood.  Rather, in this

23  situation, the individual states may define the appropriate standard of liability for defamation,

24  provided they do not impose liability *without fault*.") (emphasis added).

25  What standard of fault is required turns on whether the statement is defamatory per se,

26  whether the statement relates to a matter of public concern, and what damages are sought.  Under

27  the California Civil Code, there is libel per se when the libel is defamatory on its face, *i.e.*,

28  "without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic

United States District Court
Northern District of California

fact." Cal. Civ. Code § 45a (addressing libel on its face). There is slander per se when, *e.g.*, a

statement falsely "[c]harges any person with crime." *Id.* § 46(1) (addressing slander); *see also*

*Regalia v. The Nerthercutt Coll.*, 172 Cal. App. 4th 361, 367-68 (2009) (noting that "[a] slander

that falls within the first four subdivisions of Civil Code section 46 is slander per se").

In the instant case, Mr. Zoellner is claiming defamation per se because Chief Chapman's

statement was defamatory on its face, falsely charging him with a crime he did not commit.

Because defamation per se is at issue, Mr. Zoellner can seek either actual damages *or* assumed

damages. *See also* Opp'n at 30 (suggesting that Mr. Zoellner has been injured because his "life

was threaten[ed]," he lost his job, and he remained in jail).

For actual damages (*e.g.*, harm to occupation, reputation, etc.), Mr. Zoellner need only

prove negligence because he is not a public figure. *See Khawar*, 19 Cal. 4th at 274 ("In

California, this court has adopted a negligence standard for private figure plaintiffs seeking

compensatory damages in defamation actions."); *see also* CACI 1702 (providing that plaintiff

must prove that defendant "failed to use reasonable care to determine the truth or falsity of the

statement(s)").[19] However,

> [i]f [name of plaintiff] has *not* proved any actual damages for harm
> to reputation or shame, mortification, or hurt feelings but proves by
> clear and convincing evidence that [name of defendant] *knew the
> statement(s) [was/were] false or that [he/she/nonbinary pronoun]
> had serious doubts about the truth of the statement(s)*, then the law
> assumes that [name of plaintiff]'s reputation has been harmed and
> that [he/she/nonbinary pronoun] has suffered shame, mortification,
> or hurt feelings. Without presenting evidence of damage, [name of
> plaintiff] is entitled to receive compensation for this assumed harm
> in whatever sum you believe is reasonable. You must award at least
> a nominal sum, such as one dollar.

CACI 1702 (emphasis added). Thus, for recovery of either punitive damages or damages for

presumed injury, "even a private figure plaintiff must prove *actual malice* if the defamatory

statement involves matters of public concern" *Khawar*, 19 Cal. 4th at 274 (emphasis added).

In the instant case, Chief Chapman argues that there is no genuine dispute of material fact

---

[19] CACI 1702 is the instruction to be given when the plaintiff is a private figure but the statement
at issue relates to a matter of public concern. Here, there is no real dispute that Chief Chapman's
statement relates to a matter of public concern.

1    that he did not act either negligently (actual damages) or with malice (presumed damages).  Chief

2    Chapman is entitled to summary judgment on presumed damages because there is no evidence of

3    malice on his part.  With respect to negligence, the probable cause analysis above essentially

4    applies here too – *i.e.*, Chief Chapman was entitled to rely on his subordinates.  However, even if

5    that were not the case, he would still be entitled to summary judgment on actual damages for the

6    reasons discussed below.

7                    d.    Damages

8         Finally, Chief Chapman argues that he is also entitled to summary judgment because there

9    is no evidence that his statement caused Mr. Zoellner injury.  Rather, Chief Chapman asserts, Mr.

10   Zoellner suffered the claimed injuries simply because of the charges that had been filed against

11   him.

12        Chief Chapman's position has merit, although it is applicable only to the extent Mr.

13   Zoellner seeks actual damages.  *See* CACI 1702 (providing that for actual damages, the plaintiff

14   must prove that the defendant's "wrongful conduct was a substantial factor in causing," *e.g.*, harm

15   to the plaintiff's occupation or reputation).  (The argument would not affect assumed damages.)

16   There is no evidence supporting a causal connection between Chief Chapman's statement

17   specifically and Mr. Zoellner's claimed actual damages (*e.g.*, lost job).  As Chief Chapman points

18   out, Mr. Zoellner has not put forward any evidence suggesting that his actual damages were the

19   result of Chief Chapman's statement in the press and not a result of the fact that he had been

20   charged with a crime of murder.

21                4.    Summary

22        It is debatable whether Chief Chapman made a false statement given the broader context.

23   But assuming that there is a genuine dispute of falsity, the defamation claim against Chief

24   Chapman is nevertheless not viable, even at summary judgment:  for assumed damages, there is no

25   evidence of malice and for actual damages, there is no evidence of causation.  Because Chief

26   Chapman as well as Det. Sgt. Dokweiler are entitled to summary judgment, so too is the City.

27   F.   Punitive Damages

28        Finally, Defendants seek summary judgment on punitive damages.  They argue that there

1    is no evidentiary basis for such damages since they require, in essence, malice.  (Defendants seem

2    to focus on the § 1983 claims but the same would be true for the defamation claim.  *See* CACI

3    1702 (providing that a plaintiff may recover punitive damages if he can prove by clear and

4    convincing evidence that the defendant knew the statement was false or had serious doubts about

5    the truth of the statement and that the defendant acted with malice, oppression, or fraud).)

6           Mr. Zoellner did not specifically address punitive damages in his papers.  *See* Reply at 1

7    (arguing that Mr. Zoellner thus waived the right to punitive damages).  However, because Mr.

8    Zoellner did make arguments about malice, the Court does not find waiver here.

9           For the reasons stated above, none of Mr. Zoellner's claims are viable except for the claim

10   for malicious prosecution against Det. Losey.  Because there is a genuine dispute of fact as to

11   whether Det. Losey deliberately fabricated evidence, punitive damages are available against him.

12                               **III.**      **CONCLUSION**

13          For the foregoing reasons, the Court grants in part and denies in part Defendants' motion

14   for summary judgment.  The claims for unlawful arrest/imprisonment, deliberate indifference to

15   serious medical need, and defamation are dismissed in their entirety.  The Court also dismisses the

16   malicious prosecution claim, except as to Det. Losey.  Accordingly, the only claim that shall

17   proceed to trial is the claim for malicious prosecution against Det. Losey.  After this claim is tried,

18   the Court shall move on to litigation of the bifurcated claim for wrongful threat of criminal

19   prosecution/IIED.

20          This order disposes of Docket No. 208.

21

22          **IT IS SO ORDERED**.

23

24   Dated: March 1, 2022

25

26                                                  _____

27                                                  EDWARD M. CHEN
                                                    United States District Judge
28

United States District Court
Northern District of California