PATRICK D. MORIARTY, State Bar No. 213185
pmoriarty@cmtrlaw.com
JOHN B. ROBINSON, State Bar No. 297065
jrobinson@cmtrlaw.com
CASTILLO, MORIARTY, TRAN & ROBINSON
75 Southgate Avenue
Daly City, CA  94015
Telephone:      (415) 213-4098

Attorneys for Defendant
ERIC LOSEY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYLE CHRISTOPHER ZOELLNER,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ARCATA, City of Arcata's Police Chief THOMAS CHAPMAN, City of Arcata's City Manager, KAREN DIEMER, City of Arcata Vice Mayor SOPHIA PEREIRA, Arcata Police Sgt. TODD DOKWEILER, Arcata Police Officer ERIC LOSEY, Arcata Police Officer DEVIN NELSON, Arcata Police Officer KRYSTLE ARMINIO, Arcata Police Officer JACOB MCKENZIE, and DOES 1-81 INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AS A POLICE OFFICER FOR THE CITY OF ARCATA,<br><br>Defendants. | Case No. 3:18-cv-04471-JSC<br><br>**DEFENDANT ERIC LOSEY'S MEMORANDUM RE PROBABLE CAUSE**<br><br>Hon. Jacqueline Scott Corley |

///

///

///

///

///

///

///

1

DEFENDANT'S MEMO
RE PROBABLE CAUSE
3:18-CV-04471

## I. INTRODUCTION

The issue before the Court is probable cause. (Trial Transcript, at 355:1-2). "[P]robable cause is an issue for the Court to decide." (Doc. 299, at 4:1; see also CACI No. 1500). "In resolving that issue, the first question is what Detective Losey knew at the time he allegedly caused the charges to be filed against Mr. Zoellner. If there is a dispute as to what he knew, the jury resolves those disputes of fact. Once those facts are established, the Court decides whether they constitute probable cause." *Id*., at 1-5 (citing *Est. of Tucker ex rel. Tucker v. Interscope Recs., Inc.*, 515 F.3d 1019, 1031 (9th Cir. 2008).

The undisputed evidence in the instant case shows that ample probable cause supported Plaintiff's arrest. Plaintiff has repeatedly stated that the facts are not in dispute – only "the interpretation of the facts." (Doc. 366, at pg. 1). The Court required the parties to "submit in writing if you believe there are any disputes of fact relevant to probable cause that the jury should decide and should be specially instructed." (777:20-23). Plaintiff's responsive filing stated, "Plaintiff Kyle Zoellner believes that the underlaying (sic) facts **are not in dispute**. For example, Plaintiff does not believe that the police reports and witness statements prepared are disputed. Another words (sic) Plaintiff has no dispute as to location of the location of the blood found at the scene, the location of altercation (sic) which involved Zoellner and Lawson…" (Doc. 366, at pg. 1).

## II. PROBABLE CAUSE

Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity… **Probable cause 'is not a high bar.'**" *District of Columbia v. Wesby,* 138 S.Ct. 577, 586 (2018) (emphasis added). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a Conviction…" *Adams v. Williams*, 407 U.S. 143, 149 (1972). Rather, "Probable cause need only exists as to any offense that could be charged under the circumstances." *Blankenhorn v. City of Orange*, 485 F.3d 463, 473 (9th Cir. 2007).

CASTILLO, MORIARTY, TRAN & ROBINSON, LLP
75 Southgate Avenue
Daly City, California 94015

"For information to amount to probable cause, it does not have to be conclusive of guilt, and it does not have to exclude the possibility of innocence…" *Garcia v. Cnty. of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011). "Police are not required to believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence that a suspect has committed a crime." *Id.* All that is required is that – as here – the facts fall on the side of probability. *Brinegar v. U.S.,* 338 U.S. 160, 176 (1949); *Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004). Further, once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused, and officers are "not required by the Constitution to investigate independently every claim of innocence…" *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003), citing *Baker,* 443 U.S. at 145-146.

### III.     TRIAL TESTIMONY REGARDING PROBABLE CAUSE

<u>Eric Losey</u>

Eric Losey knew what Dokweiler knew about the investigation. (706:4-7). He was also aware of officer Nilsen's report. (705:13-15). He watched Nilsen's MAV before April 17, 2017. It helped with his investigation. He could see Zoellner's appearance. Zoellner had sustained some injuries, but the blood on Zoellner did not correspond to his injuries.

Losey visited the crime scene, which was very dark. Losey took that darkness into consideration during his investigation and when he talked to witnesses. (727:22-178:8). Losey knew that Nilsen got to the scene within moments of the dispatch and there was a group of people that directed him to Zoellner. (735:20-25). Losey knew that Nilsen put handcuffs on Zoellner and Zoellner said very little. (736:3-6).

Losey was aware that Brandon Thomas ("BT") tried to pull Zoellner out of the car seemingly out of anger for what had occurred, which shows Zoellner is an appropriate suspect. (705:22-23; 706:2-3; 736:7-737:12).

Losey was aware of Paris Wright's statement at the scene was similar in substance to the later statement he provided to Dokweiler. Wright's statement remained the same, which made him credible. Also, Losey knew that an unknown person came up to Nilsen (while he was speaking

CASTILLO, MORIARTY, TRAN & ROBINSON, LLP
75 Southgate Avenue
Daly City, California 94015

1  with Wright) and said, "they ran off that way." Wright responded, "No. They got him in the car."
2  (737:12-739:10). Wright could have easily put a knife into Zoellner's hand. (739:10-740:2). He did
3  not. This underscores why police (notably Losey) and the prosecution found him credible. Losey
4  interviewed Keaundrey Clark on April 17, 2017, at Humboldt State University. Clark's statement
5  corroborated Wright's statements. Clark did not directly witness the stabbing, but the saw Wright
6  fighting with Zoellner in the grassy area. (740:2-741:13).

7        Losey interviewed Elijah Chandler on April 17, 2017, at Humboldt State
8  University. Chandler did not witness the stabbing, but he witnessed Wright and Zoellner in an
9  altercation immediately afterward. Chandler's statement supported Wright's version of events.
10 (741:14-742:12) Losey knew what Dokweiler knew about the investigation.  (706:4-7).

11       Losey knew that Zoellner drove his Subaru to 1120 Spear Avenue on the night to retrieve
12 his girlfriend. He parked in the cul-de-sac in the same place noted by Dokweiler in Exhibit 28.
13 (742:13-744:9). The stabbing took place where the "X" is in Exhibit 28. (743:22-744:2).

14       Losey knew that the knife was found under a red Mustang parked next to the grassy area
15 where the stabbing took place. (744:10-745:5; 727:10-21). He knew the knife blade was 5.5-6
16 inches long. Losey attended the autopsy. The cause of death was a stab wound. The largest
17 puncture wound was 3.5 inches. The blade on the knife round was an adequate length to cause
18 injury; a knife with a 2-inch blade would not have been. (745:6-748:5).

19       Losey knew there was a pool of Lawson's blood on the cul-de-sac in front of the
20 Mustang. At a certain point in the investigation, it was believed that the stabbing took place near
21 the blood on the cul-de-sac. The understanding of the location where the stabbing occurred
22 changed with more information, witness statements, and the development of the investigation.
23 (748:6-24).

24       The blood in Exhibit 28 (Bates 1769) came from Lawson when he was treated. (748:25-
25 749:11). Losey viewed Exhibit 1 (Bates 1328), Exhibit 6 (Bates 1793), and Exhibit 6 (Bates 1794)
26 before the preliminary hearing. He also viewed photographs of Zoellner's sweatshirt. He viewed
27 photos of his t-shirt, which were Exhibit 6 (Bates 1800 and 1801). Those photographs of
28

Zoellner's clothes assisted him in his belief that Zoellner had killed Lawson. The amount of blood on Zoellner's clothing and the location of the blood on his clothing shows that the blood did not come from him but from David Josiah Lawson. The blood on the t-shirt showed that the blood leached through the hoodie. (749:12-753:5).

Losey knew that a knife bag and knives were found at Zoellner's apartment. Losey was present at the execution of the search warrant that led to Exhibits 2 (Bates 1354), Exhibit 7 (Bates 1825), Exhibit 2 (Bates 1392), Exhibit 2 (Bates 1416), Exhibit 2 (Bates 1417), Exhibit 2 (Bates 1419), Exhibit 2 (Bates 1420). The knives at Zoellner's home suggested to Losey that Zoellner was no stranger to knives. He has a variety of knives. The police were not just looking for a Henkels brand knife, the type of knife Zoellner used to stab Lawson. (753:6-755:17). Henkels knives were located at Uniquely Yours, Zoellner's place of employment. (757:5-758:5).

Zoellner's job as a chef signaled to Losey that he could be a suspect in a case where the weapon is a kitchen knife. Losey has responded to dozens of stabbing incidents that occurred outside. Losey does not recall one case where a kitchen or steak knife was used outside. (755:18-757:1).

Losey understands probable cause to be the burden of proof for arrest and to hold a defendant for jury trial. From April 17, 2017 until May 5, 2017, Losey never doubted the probable cause for Zoellner as the individual who killed Lawson. When he learned that he was mistaken in his Martinez report, Zoellner never doubted the probable cause that Zoellner was the person who killed Lawson. (759:2-13).

The evidence Losey knew from April 15, 2017 to May 5, 2017 led Losey to no other suspects and helped in is assessment that Zoellner was the correct person. (759:14-19). Losey was aware of 20 witnesses who had been interviewed from April 15, 2017 to May 5, 2017. None of those witnesses provided Losey with another person who might have a motive to kill David Josiah Lawson. (759:20-760:3).

Losey has no doubt Zoellner was the right person and that Zoellner stabbed Lawson. (760:1-8).

///

1    Todd Dokweiler

2    Todd Dokweiler knew that when Nilsen got to the scene, people were pointing at Zoellner
saying, "That's the guy that did the stabbing." (473:16-474:2). Dokweiler took a statement from
Paris Wright on April 17, 2017. Wright saw Lawson and Zoellner engaged in a fight on the
ground, he separated the two, and he discovered that Lawson had been stabbed. (476:1-477:3). In
his statement, Wright never said he saw Zoellner put a knife into Lawson. Dokweiler found Wright
to be credible. Wright and Lawson were friends. He had a bias, but Wright told the same to
Dokweiler as he said to Nilsen: "Mr. Wright easily could have told me that he did see a knife, and
he chose not to do that." That added to his credibility. Wright testified at preliminary hearing
consistent to his two prior statements. (477:4-478:23.). Also, Dokweiler knew that Clark and
Chandler's statements were consistent with Wright's statement. (506:3-508:8).

Dockweiler knew that Zoellner believed he drove by himself to the party when he believed
Ms. Ortega's phone had been stolen. He parked in the cul-de-sac. The cul-de-sac was dark for
stabbing. Darkness and wetness played a big role in the investigation. Arcata is foggy and
rainy. (482-3-486:14).

Dockweiler knew that inebriated witnesses played a role in the investigation. Recollection
can be difficult, and perception can be distorted. The investigators asked witnesses if they had been
drinking at the party. (486:14-487:17).

Dockweiler testified that Exhibit 28 (Bates 1755) shows the location of the stabbing, where
Zoellner parked his car, and the Mustang under which the knife was located. The location of the
knife added to probable cause because the knife was found immediately adjacent to where the fight
occurred. (488:13-491:20).

Dokweiler knew that Zoellner worked as a chef. It was not unusual not to have blood on
the knife. Often there is very little blood. It is not uncommon for someone to wipe off a weapon
after they have used it. The length of the knife was large and wide enough to have made the stab
wounds in Mr. Lawson. (491:21-493:12).

Dokweiler suspected that the blood in the pool in front of the Mustang came from Lawson
(Exhibit 28, Bates 1762). Lawson ended up where the blood is seen in Exhibit 28 (Bates 1769).

CASTILLO, MORIARTY, TRAN & ROBINSON, LLP
75 Southgate Avenue
Daly City, California 94015

1  (493:13-495:3).

2  Dokweiler also considered Devin Nilsen's MAV recording (Exhibit 10), which depicts
3  Paris Wright trying to calm the crowd. He had no blood on his clothes. (504:8-505:2). The MAV
4  also shows Paris Wright's statement to Nilsen. The statement is consistent with the statement
5  provided to Dokweiler and at the preliminary hearing. (505:9-506:2).

6  The photographs of Zoellner's pants shows a large amount of blood that came from
7  Lawson. The amount of blood on Zoellner's pants is not consistent with his injuries and being in a
8  fistfight. The blood is consistent with someone in direct contact with someone bleeding
9  profusely. The blood does not appear to be coming from his face. The blood on the clothes does
10 not look like blood from someone who has been hit in the nose. The clothes show blood transfer.
11 (520:8-531:19). The t-shirt under the hoodie had blood on it, reflecting saturation. (531:20-533:8).

12 Kitchen knives and a knife case were found at Zoellner's house. Dokweiler knew that
13 Ortega had found the knife bag in Zoellner's car and looked to see what knives were in the
14 bag. She thought one was missing. That was the car that Zoellner drove to the cul-de-sac. (533:7-
15 537:6). Dokweiler knew that Zoellner's orange knife case could hold more knives. He also knew
16 that Zoellner had other kitchen knives in his house. (537:7-542:15).

17 Dokweiler knew that Zoellner was a chef at Uniquely Yours Catering and had access to
18 Henkel knives. (542:21-544:21; 551:22-554:4).

19 Dokweiler knew that a stabbing occurring outdoors with a kitchen knife was
20 unusual. Dokweiler had investigated 25-30 stabbing cases. Only one other stabbing case had a
21 kitchen knife as the weapon. That altercation started inside a house. (544:22-545:19).

22 Dokweiler knew that Zoellner said he got into a fight with Lawson. Lawson punched
23 Zoellner before Lawson was stabbed. (565:16-19). Wright, Gleaton, McFarland, Ortega,
24 Bobadilla, Kyle Castillo, and Kristoff Castillo said that Zoellner fought with Lawson. No
25 witnesses said that Lawson fought with anyone besides Zoellner. There was no evidence of any
26 other suspect besides Zoellner. (562:21-564:1).

27 Dokweiler believed there were three fights. The first fight took place on the porch where
28 Lawson punched Zoellner in the face. The second fight happened in the grass where Wright saw

Lawson and Zoellner entangled and separated them. Wright then realized that Lawson had been stabbed. The third fight was between Wright and Zoellner, and then others from the house ganging up on Zoellner for the stabbing. (623:10-625:22).

There was no evidence that Gleaton, McFarland, Ortega, Wilkins, Bobadilla, Wright, Chandler, Clark, Murphy, or the Castillo brothers killed Lawson. (564:2-564:25). Dokweiler did not uncover any motive for anyone at the party to kill Lawson. (565:1-15).

Dockweiler testified that the forensic evidence testing (DNA) could not be completed before the preliminary hearing. (621:5-24).

Devin Nilsen

At all relevant times, Eric Losey was aware of the information obtained by Deputy Devin Nilsen. Deputy Nilsen testified that he has been a law enforcement officer for seventeen years. (870:11- 12). He was working as an APD patrol officer on April 15, 2017. (871:8-10). He wore a police uniform and drove a marked patrol vehicle. (871:12-20). He responded to a stabbing at 1120 Spear Avenue in Arcata, CA. (871:23 – 872:2). He was less than a mile away. (872:3-5). He arrived on scene less than a minute after receiving the dispatch call. (872:10-13). He was the first officer on scene. (872:19-21).

Nilsen walked down Spear Avenue looking for the victim and the suspect. (874:22-25). A group of seven to ten people yelled to Nilsen "that's the stabber." (875:4-6; 875:16-18; 876:20-22). They yelled and pointed in the same direction, towards a grassy area. (875:11-12; 875:19-20). Nilsen walked to the location and located Kyle Zoellner. (876:1-19). Nilsen did not locate any other males in the area where he found Zoellner. (876:23-25). Nilsen saw "blood on [Zoellner's] sweatshirt and on the leg parts of the sweatpants." (879:6-10).

Nilsen detained Zoellner in handcuffs. (878:13-15). None of the on lookers informed Nilsen that, for example, "'No, not that guy,' or anything like that." (878:18-19). They did not try and stop Nilsen from detaining Zoellner. (878:21-23). Zoellner complied; he was cooperative. (878:24- 25). Initially, Zoellner said nothing. (879:1-2).

After Zoellner was safely detained in the patrol vehicle, Nilsen observed "a male subject" walk towards the vehicle and bang on the rear, driver-side window (i.e., where Zoellner was

1  seated). (884:10 – 885:7). The man was angry with Zoellner and is heard on Nilsen's MAV camera

2  blaming Zoellner for stabbing his friend (Lawson). (885:11-21; see also Defense Exhibit 10 at

3  5:11).

4    Immediately thereafter, Nilsen spoke with Paris Wright. (886:13-14). This interview was

5  captured on Nilsen's MAV. (886:13-16; see also Defense Exhibit 10 at 5:52). Wright told

6  Nilsen that he "observed the altercation between Mr. Lawson and Mr. Zoellner." (886:19-20).

7  Wright saw Lawson and Zoellner fighting – when Lawson was not stabbed – "and then the

8  second time he saw them fighting, he observed that Mr. Lawson was stabbed." (887:3-8). Nilsen

9  found Wright to be credible. (887:14-15). Wright spoke with Nilsen voluntarily just moments

10 after the stabbing. (887:14-17). Wright corrected Nilsen several times, admitting that he did not

11 actually see Zoellner stab Lawson. (887:18-24). Nilsen did not observe any blood on Wright's

12 clothing or person. (888:3-10).

13   While speaking to Wright, an unknown male approached Nilsen and "told [him] that he had

14 heard that the suspect had gotten away or left in a vehicle." (888:11-18; see also Defense Exhibit

15 10 at 9:30). Wright responded and told the unknown male that he was wrong and that the suspect

16 (Zoellner) was in the back of Nilsen's patrol vehicle. (888:16-25).

17   Zoellner voluntarily spoke with Nilsen. (892:6-8). He was coherent and alert. (892:11-14).

18 Zoellner claimed that he did not remember stabbing Lawson. (893:6-8). Zoellner had no alcohol

19 in his system. (893:9 – 894:5).

20   Nilsen soon learned that a fellow officer recovered a knife under a red Mustang parked near

21 1120 Spear Avenue. (894:10-19).

22   Days after the incident, Nilsen spoke with Zoellner's employer at Uniquely Yours

23 Catering. (896:4-17). Nilsen showed the employer photographs of Zoellner's knife bag – both

24 opened and closed. (896:18 – 897:6). The employer identified the knife bag as being Zoellner's

25 and stated that "a paring knife was missing" from the bag. (896:21 – 897:11).

26   Nilsen drafted police reports to document his observations. (897:12-25). He was honest and

27 accurate. (898:6-9). Before this incident, Nilsen did not know Kyle Zoellner, Eric Zoellner, or

28 the Zoellner family. (898:10-15). Similarly, Nilsen did not know David Josiah Lawson or his

CASTILLO, MORIARTY, TRAN & ROBINSON, LLP
75 Southgate Avenue
Daly City, California 94015

1  family. (898:16-19).

### Eric Zoellner

Eric Zoellner is Kyle Zoellner's father. Relevant to probable cause, Eric Zoellner testified that he responded to the scene and spoke with Lila Ortega, Kyle Zoellner's girlfriend. (67:3-11). He observed Kyle Zoellner's Subaru near the scene of the stabbing, parked on Spear Avenue. (67:3-11).

A short time later, Eric went to the hospital to see his son. (317:3-8). When he left the hospital, he went to Kyle Zoellner's apartment to drop off Lila Ortega. (*Id.*). They entered Kyle's apartment "to see if Kyle's knife bag was there. [Lila] looked. She said the knife bag is not here. She went out to [Kyle's Subaru], opened the car door, the knife bag was in the car…" (317:3-8). Lila looked in the knife bag and told Eric Zoellner, "I think one [knife] is missing." (318:18 – 319:1).

### Maggie Fleming

Fleming was elected to be the Humboldt County District Attorney in 2015. (203:16-20). She still holds the position. Prior to serving as the District Attorney, she served as a deputy district attorney in Contra Costa County for almost eight years. (204:21-25). Prior to 2017, she tried ten murder trials (205:21-23), had conducted 30 preliminary hearings concerning homicides (206:1-3), and had charged roughly 60 homicides (206:7-12).

On April 19, 2017, Fleming charged Zoellner with the intentional murder of Lawson. (210:8-12; 210:20-23).

Fleming attended a meeting on April 17, 2017 with the following people being present: Andrew Isaac, Wayne Cox (the Chief Investigator for the DA's Office), Todd Dockweiler, and Eric Losey. (212:24 – 213:13). Fleming learned that there had been a stabbing and the police got to the location very quickly. (215:3-11). She learned that Zoellner had blood on his clothing and was arrested near the victim. (216:12-17).

Fleming considered Paris Wright's statements to police "extremely strong circumstantial evidence" that Zoellner murdered Lawson. (229:4-6). Fleming has never questioned the probable cause for the arrest of Zoellner. (220:22-25). She never received any credible evidence that

1  suggested there was another suspect besides Zoellner. (230:19-25). Even without the Martinez
2  identification, Fleming "unquestionably believed that there was probable cause for a holding
3  order" at the preliminary hearing. (246:7-12).

   Kyle Zoellner

Zoellner received a call from his girlfriend (Lila Ortega) to pick her up from the party at 1120 Spear Avenue. (798:5-17). While driving to 1120 Spear Avenue, Zoellner received another call from Ortega advising him that "her phone had gone missing." (799:19-21).

Zoellner arrived and walked up to the party-goers and saying, "Hey, what's up, bro?" (804:2-4). A short time after that, Lawson punched Zoellner for – according to Zoellner – no reason. (804:5-15).

Kyle Zoellner has zero memory of the incident. (804:19-21). He has zero memory "from the time that [he was] hit until [he] ended up in general population in jail." (804:22-25). Despite him being alert and chatty in Nilsen's MAV, Zoellner claimed he "lost consciousness; and then, like I said, the next thing I remember is just waking up in jail." (805:1-3). Zoellner never suffered any type of memory loss before the incident. (805:9-20). He has never suffered memory loss since the incident. (805:22 – 806:1). This was the only time in his life that he suffered complete memory loss. (806:2-4). Before he "went unconscious," Zoellner did not see anyone else with a kitchen knife. (841:10-12). He never saw anyone else fighting with Lawson. (841:17-18).

Zoellner claims all of the blood on his clothing came from a nosebleed and the cuts on his face. (819:1-10).

### III.  CONCLUSION

Malicious prosecution requires Zoellner to prove that Losey did not reasonably believe there were grounds for causing Zoellner to be prosecuted. This is known as the probable cause requirement. Probable cause is to be decided by the Court as a matter of law. The ample evidence in the record (see above) overwhelmingly demonstrates that Plaintiff cannot prove that Eric Losey reasonably believed there was no probable cause for the proceeding.

///

///

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated:  October 12, 2022 | CASTILLO, MORIARTY,<br>TRAN & ROBINSON, LLP |
|  | By: */s/ John Robinson*<br>     PATRICK D. MORIARTY<br>     JOHN B. ROBINSON<br>     Attorneys for Defendant<br>     ERIC LOSEY |

CASTILLO, MORIARTY, TRAN & ROBINSON, LLP
75 Southgate Avenue
Daly City, California 94015

12

DEFENDANT'S MEMO
RE PROBABLE CAUSE
3:18-CV-04471