```
 1                SUPERIOR COURT OF CALIFORNIA

 2                     COUNTY OF HUMBOLDT

 3            HONORABLE DALE A. REINHOLTSEN, JUDGE

 4                         .   .   .

 5

 6  PEOPLE OF THE STATE OF CALIFORNIA,

 7                     Plaintiff,

 8         vs.                           No. CR1701730

 9  KYLE CHRISTOPHER ZOELLNER,

10                     Defendant.

11  _____/

12

13                   REPORTER'S TRANSCRIPT

14                          OF

15                   PRELIMINARY HEARING

16                         .   .   .

17                   FRIDAY, MAY 5, 2017

18                         .   .   .

19

20

21                   A P P E A R A N C E S

22  For the People:              For the Defendant:

23  Maggie Fleming               David Marcus
    District Attorney            Public Defender
24  By ROGER REES                By LUKE BROWNFIELD
       JESSICA WATSON                KELLY NEEL
25  Deputy District Attorneys    Deputy Public Defenders
    825 Fifth Street             1001 Fourth Street
26  Eureka, CA 95501             Eureka, CA 95501

27

28
```

REPRODUCTION OF TRANSCRIPT PROHIBITED PER GOVERNMENT CODE 69954(D)

1                    FRIDAY, MAY 5, 2017
2                         2:01 P.M.
3                          .  .  .
4            THE COURT:  All right.  Call the matter of
5    People versus Zoellner.  Mr. Zoellner is present,
6    represented by Mr. Brownfield, Ms. Neel.  Mr. Rees and
7    Ms. Watson representing the People.
8            Thank you for your patience to allow me an
9    opportunity to review all the evidence in this matter.
10           Just so we know where we start out from, a
11   preliminary hearing is a probable cause hearing, and the
12   test that is applied by the Court is stated various
13   ways, but it's essentially there has to be evidence that
14   establishes sufficient cause to believe that the
15   defendant committed each element of the offense.  And
16   sufficient cause is -- is defined as:  Such state of the
17   facts that would lead a person of ordinary caution or
18   prudence to believe and conscientiously entertain a
19   strong suspicion of the guilt of the accused.  And as,
20   actually, Mr. Rees pointed out earlier in the argument,
21   it's a standard of proof less than a preponderance of
22   the evidence that's required in a civil case.  But
23   that's the standard we're talking about.
24           And I have reviewed the evidence that has been
25   submitted.  I think large -- for anybody who's been here
26   and listened to it all, I think it has been somewhat
27   confusing, somewhat contradictory.  And I think
28   that's -- frankly, can be explained by the fact that

1  this event took place April 15th, 2017, which is
2  approximately 16 days ago.  I don't think there's
3  been -- I would assume there has not been adequate time
4  to -- to have testing of all the evidence -- all the
5  physical evidence.  Certainly of the hundred or so, or
6  plus or minus, people that were there, only a handful
7  really have been interviewed as to what occurred.
8          And as I go through and just -- I'm not gonna
9  discuss in a great deal of detail the evidence, as I
10 think counsel both this morning discussed it.  But as I
11 go through it, I'm not suggesting that -- for the most
12 part, that I find that anybody's not being truthful.  I
13 think the confusing and contradictory evidence that we
14 received is a product in part of, you know, a party,
15 lots and lots of people there.  Very emotional and very
16 traumatic events, various states of sobriety.  And
17 people see different things.  And for anybody that's
18 been on a jury before, jurors are told at the beginning
19 of the case that two people may see the same event,
20 but -- but hear or see it differently and recall it
21 differently.  So I'm not suggesting that anybody is --
22 for the most part, is intentionally not being forthright
23 in what they've told us.
24         But when you go through and look at the
25 evidence, just -- and I'm gonna concentrate more on what
26 happened after -- we have the testimony concerning the
27 first -- first confrontation.  We know that concluded.
28 I think the bulk of the evidence -- or certainly a

1  substantial part of the evidence suggests that there
2  were blows struck by both the defendant and some of the
3  folks that were on the porch coming out of the house.
4  It sounded like the defendant got the worst of it.  And
5  as the people withdrew from the first altercation,
6  he's -- he's either against the car or on the ground
7  near the car, which I presume is one of the cars that
8  were in the driveway.
9          When we come back to the second event, that
10 seems to be triggered by the -- and I forget the names
11 all, but the girlfriend of Mr. Lawson going back to
12 confront or discuss with the folks how the pepper spray,
13 or whatever, was sprayed.
14         I think the testimony particularly from Ms.
15 Gleaton -- she -- her observation was that the defendant
16 was trying to pull Mr. Lawson's girlfriend off of his
17 girlfriend.  That Mr. Lawson -- there was some -- by the
18 time Mr. Lawson got back there, there might have been
19 some confrontation between the defendant and Mr. Lawson.
20 But Ms. Gleason (phon.), at least as I understood her
21 testimony, said that she recalls the people -- the
22 defendant and whoever was involved in that incident
23 being -- immediately going over to the area of the tree
24 and grassy area on the left.  The -- concerning what was
25 going on at that point, first Ms. Gleas- -- Ms. Gleaton
26 indicated she did not see any knife or any suggestion
27 that a knife was used.
28         Mr. Wright -- Mr. Wright's testimony is --

1  it's hard to put in time sequence, but Mr. Wright says
2  that he follows Mr. Lawson back up to the area where the
3  confrontation initially took place.  When he gets
4  there -- and as I understand it, he's only seconds
5  behind him -- he sees the defendant -- or Mr. Lawson
6  having the defendant in a headlock on the grassy area to
7  the -- to the left of the house.  Not all the way to the
8  tree, but in the area of the tree.  He breaks up the --
9  or attempts to break up the confrontation and -- because
10 he's afraid that Mr. -- the complaining -- that
11 Mr. Lawson is going to strangle the defendant.  And he
12 breaks it up.  He also testifies he saw no knife and saw
13 no one else in the area.  And after he separates them,
14 he indicates that he strikes Mr. -- the defendant a
15 couple of times.
16         Mr. Martinez testified that he observes --
17 during the same timeframe, he observes two people in the
18 grassy area talking to each other.  He -- I believe he
19 said it was -- he believed it was the defendant and
20 Mr. Lawson.  They were talking to each other.  They were
21 in a confrontational stance.  That he saw the defendant
22 make some gestures with his hand towards Mr. Lawson.
23 And then he saw Mr. Lawson run from that area across the
24 cul-de-sac and into the grassy area where he eventually
25 landed.  He does not see a knife.  He doesn't see any
26 other persons in the area.  And then he goes up to -- to
27 console Mr. Lawson's girlfriend and eventually goes over
28 to where Mr. Lawson ended up on the other side of the

1   cul-de-sac, where he said Mr. Chandler was already there
2   assisting, rendering first aid.  He also -- no knife, no
3   other people in the area.
4              And it seems to me that those two versions of
5   what happened are diametrically opposed.  Because the
6   one person who attributes any sort of gesture to the
7   defendant that might be consistent with jabbing somebody
8   with a knife is Mr. Martinez.  But Mr. Martinez has that
9   happening and then the defendant -- or the victim,
10  Mr. Lawson, immediately running across the cul-de-sac
11  over to the brushy area.  Doesn't see anybody else
12  there.  That's inconsistent with the observations of --
13  of Mr. Wright.
14             Mr. Clark comes out from behind the -- behind
15  the house.  He sees -- he testifies, as I understand
16  it -- he sees the defendant and Mr. Wright, Paris, in a
17  combative stance.  He does not see Mr. Lawson in the
18  area.  That Paris then hits the defendant, knocks him to
19  the ground, and ten other people come out of the house,
20  approximately, and begin kicking and hitting the
21  defendant.
22             And Mr. Chandler says he is in the backyard.
23  He comes -- he comes out of the backyard into the area
24  in front of the house.  He sees Mr. Paris (sic) standing
25  near the tree, the defendant attempting to move out of
26  the area.  And he sees -- he says he sees something in
27  the defendant's right hand.  Mr. Paris (sic) knocks him
28  to the ground, and he falls to the ground, and whatever

1  he has in his hand drops out on the ground.
2              So -- but all of those -- all those folks,
3  everybody who's testified thus far, has not testified
4  that anybody had a knife and certainly didn't say that
5  the defendant had a knife.  And Mr. Paris didn't -- or
6  Mr. Wright -- I'm sorry -- didn't testify that when --
7  if anything fell out of Mr. Zoellner's hand, that it was
8  a knife or that he, in fact, even saw anything fall out
9  of his hand.
10             So again, I'm not suggesting anybody's not
11 truthful.  I just think everything's happening so
12 quickly, there are various things happening, people are
13 seeing things differently.  But I have to weigh that
14 evidence in terms of whether there's reasonable cause to
15 believe that Mr. Zoellner, in fact, stabbed and killed
16 Mr. Lawson.
17             The physical evidence, when you -- when you
18 take the physical evidence along with the -- what I find
19 to be confusing evidence as to what actually happened,
20 you have a pool of blood in the driveway of the -- of
21 the -- approaching the house.  And you have both
22 Detective Losey and Officer Arminio saying that the pool
23 of blood is located there.  Then there's drippings or
24 droppings that are going to the location -- or towards
25 the location which Mr. Lawson was ultimately found, and
26 that there's another pool of blood there.  There's no
27 evidence -- no testimony, at least, concerning any blood
28 located in the grass area where most people say these

1  fights were taking place.
2        The parties have stipulated that the analysis
3  of the evidence conducted thus far -- there's a
4  fingerprint found on the knife and that the fingerprint
5  is excluded as being the defendant's fingerprint.  There
6  are fibers found on the knife, and, at least at this
7  stage of the proceedings, those fibers have been
8  determined to be dissimilar from clothing that was worn
9  by the defendant that evening.
10       There's no testimony or no evidence to suggest
11 that the knife that was found was a knife that was owned
12 by the defendant.  In fact, the testimony is contrary,
13 that the type of knives that the defendant had that he
14 used for his employment -- his employer came in and
15 testified that the knife that was observed -- or
16 photographed as an exhibit in this case was not a knife
17 he'd seen before, not a knife that's been used by the
18 defendant at his place of employment, nor was it one
19 that he would expect to be used in a -- in a catering or
20 restaurant business.  That's the evidence before us.
21 There's no contrary evidence to that.  Maybe there will
22 be developed some time in the future, but at this point,
23 there is not.
24       And then one of the problems I think we have
25 is -- or one of the issues I think we have is the fact,
26 as I indicated, we're 16 days after the incident
27 occurred.  Other than cause of death, there's no
28 testimony from an autopsy surgeon, testimony that you

1   might expect in a case such as this such as to the --
2   the exact location and nature of the wounds, the size of
3   the wounds, the type of instrument that may have
4   inflicted the wounds, whether the knife located at the
5   scene of the incident is of the size and shape that
6   would've inflicted those sorts of wounds.  We don't have
7   any blood analysis as to blood on the -- particularly on
8   the defendant, whose blood it was if it wasn't his.
9            So it seems to me that we're in a situation
10  where, ultimately -- and I think this is the -- for me
11  at least, this is the difficult part of the case, at
12  least at this beginning, is that the only people --
13  based on what we know, based on the evidence presented,
14  the only persons or group that might have a motive to
15  inflict this type of injury upon Mr. Lawson would be --
16  at least the way I view the evidence, would be the folks
17  who they had a confrontation with, the defendant and the
18  people that were with them.  On the other hand, the
19  analysis -- the evidence -- the physical evidence
20  doesn't have anyone -- of all the people there, no one
21  sees a knife.  No one sees the defendant with a knife.
22  No one sees any kind of confrontation between the
23  defendant and the -- Mr. Lawson that would suggest any
24  kind of instrument was being used, other than
25  Mr. Gonzalez (sic), whose testimony is completely
26  contrary to what other folks say.  And it's hard to even
27  fit it into the time sequence to -- so it's just -- it's
28  a very difficult, confusing factual situation that at

1    this point I don't believe has been sufficiently
2    developed to really be able to establish that the
3    defendant is the person who inflicted the injuries.
4              And again, the physical evidence, the location
5    of the pools of blood, the knife -- there's no proof
6    that this was, in fact, even the knife that was used.
7    There's no proof as to ownership of the knife.  The
8    knife has fibers and fingerprints not associated with
9    the defendant.  There's -- I guess there's all kinds of
10   speculation we can enter into, but how the knife,
11   assuming it was used by somebody in the confrontation,
12   would've gotten to the -- underneath the car in such a
13   short period of time, particularly with Mr. Paris' (sic)
14   testimony, if it's accepted, that Mr. Lawson had the
15   defendant in a -- in a headlock and a body lock with his
16   arms.
17             You know, obviously -- I don't mean this in
18   any way facetiously.  Obviously, we know Mr. Lawson was
19   killed.  We know he was killed by a knife.  And we know
20   somebody at that party did it.  But at this point, I
21   don't believe that the evidence is sufficient to
22   establish reasonable cause to believe that the defendant
23   is the person who did it at this point.  And I -- we're
24   16 days after the incident took place.  I assume
25   evidence is gonna be continued to be pursued, analyzed.
26   Witnesses will be -- be questioned.  But at this point,
27   if you really step back and look at the evidence, no one
28   sees a knife.  No one sees the knife used.  The only

1   person who sees any gesture that can be associated with
2   a jabbing-type situation is Mr. Gonzalez (sic).  Ms. --
3   Mr. Lawson's girlfriend has some sort of puncture wound
4   on her wrist.  We don't have any explanation how that
5   occurred or how that might have been put on her.
6             I just don't believe that -- under the
7   evidence that's presented 16 days after the incident and
8   the test that the Court has to apply, that the evidence
9   meets the requirement.  Again, that requirement is that:
10  Such a state of the evidence that would lead a person of
11  ordinary caution or prudence to believe or
12  conscientiously entertain a strong suspicion of the
13  guilt of the accused.  And at this point, I don't find
14  the evidence is sufficient to make that finding.  That
15  is not to say that evidence may be developed in the
16  future that may very well suggest to the contrary or may
17  very well identify someone else who may have done this.
18  Because that's the one thing we're certain about.  It
19  happened.  Mr. Lawson was stabbed to death at a party
20  with lots and lots of people there.  And none of those
21  people seem to have seen it happen, which is somewhat
22  difficult to believe.
23            But anyway, based upon the evidence that's
24  been presented thus far -- the other thing I'd like to
25  say -- I think -- I think both counsel commented upon
26  this.  I'm very impressed -- given the emotional nature
27  of this case, the obvious trauma that everybody
28  suffered, that it would've been so easy for someone to

1  say, "Yeah, I saw this guy had a knife in his hand."
2  That's all it would've taken, and then Mr. Zoellner
3  would've been held to answer.  But to the credit of the
4  people who testified, no one said that.  And it would've
5  been easy to do if they wanted to just lay this on him.
6  And it didn't happen, so -- to that -- and everybody
7  that's testified that he was basically -- that the
8  defendant was not argumentative, not trying to create a
9  situation.  And so I think that's to the credit of the
10 witnesses who testified, too, given the emotions and
11 given the factions that are involved.  So -- but for all
12 those reasons, I find that, at this point at least,
13 there's not sufficient evidence to hold Mr. Zoellner to
14 answer to the charge and dismiss the complaint.
15           MR. REES:  Thank you, your Honor.
16           MS. NEEL:  Thank you, your Honor.
17           MR. BROWNFIELD:  Your Honor, I would request a
18 transcript of the hearing.
19           THE COURT:  Right.  We'll order a transcript.
20           THE CLERK:  Mr. Brownfield, Mr. Rees, do you
21 want to stipulate to return of exhibits?
22           MR. REES:  I would ask for a stipulation of
23 return of exhibits.
24           MR. BROWNFIELD:  That's fine.
25           (Proceedings concluded at 2:20 p.m.)
26                         .  .  .
27
28

```
STATE OF CALIFORNIA  )
                     ) ss.
COUNTY OF HUMBOLDT   )
```

### CERTIFICATE OF REPORTER

I, SABRINA M. SHAHA, a Certified Shorthand Reporter of the State of California, do hereby certify that the foregoing pages, numbered 1 to 449 and 683 to 938, are a true and correct transcription of my shorthand notes taken on the 1st, 2nd, 4th and 5th days of May, 2017, in the matter entitled PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, versus KYLE CHRISTOPHER ZOELLNER, Defendant, No. CR1701730 in the criminal files of the Superior Court of California, County of Humboldt.

Dated this 31st day of January, 2020.

_____
SABRINA M. SHAHA
Certified Shorthand Reporter #9665