1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   KYLE CHRISTOPHER ZOELLNER,              Case No. 18-cv-04471-JSC

8                    Plaintiff,

9          v.                               **ORDER RE: LACK OF PROBABLE
                                            CAUSE ELEMENT**
10  ERIC LOSEY,
                                            Re: Dkt. Nos. 372, 381
11                   Defendant.

12

13          This action arises out of the stabbing death of David Josiah Lawson on April 15, 2017, in

14  Arcata, California.  Kyle Zoellner was arrested and charged with Mr. Lawson's murder.  However,

15  following a preliminary hearing that began 10 business days after the district attorney filed the

16  charge, a state court judge found that the district attorney had not proved probable cause to hold

17  Mr. Zoellner for trial and dismissed the murder charge without prejudice.  Mr. Zoellner thereafter

18  initiated this action.  After the district judge previously assigned to this case ruled on Defendants'

19  motion for summary judgment, the claim remaining for the upcoming trial was Mr. Zoellner's

20  malicious prosecution claim against former Arcata Police Detective Eric Losey.  One element of

21  that claim requires Mr. Zoellner to prove that no reasonable officer with Mr. Losey's knowledge

22  would have probable cause to believe Mr. Zoellner stabbed Mr. Lawson.  After hearing the

23  evidence at trial, considering the parties' post-trial briefs (Dkt. Nos. 372, 381), and holding oral

24  argument on October 13, 2022, the Court concludes that Mr. Zoellner has not proved the lack of

25  probable cause element of his malicious prosecution claim.

26                                  **DISCUSSION**

27  **I.     Relevant Procedural History**

28          To prevail on his malicious prosecution claim, Mr. Zoellner must prove "that the prior

1   action (1) was commenced by or at the direction of the defendant and was pursued to a legal

2   termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated

3   with malice." *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019) (cleaned up; quoting

4   *Sheldon Appel Co. v. Albert & Oliker*, 765 P.2d 498, 501 (Cal. 1989)); *see also id.* ("Federal

5   courts rely on state common law for elements of malicious prosecution.").

6        Prior to trial, Mr. Zoellner moved in limine that issue preclusion barred Mr. Losey from

7   challenging the lack of probable cause; that is, that the state court judge's dismissal of the murder

8   charge following the preliminary hearing is binding on Mr. Losey in this action. The Court denied

9   the motion on the grounds that Mr. Zoellner had not shown that Mr. Losey was in privity with any

10  party to the preliminary hearing proceedings. (Dkt. No. 306 at 1–4; *see* Dkt. No. 299 at 2–4.) The

11  Court also ruled that whether there was probable cause for the criminal charge is an issue for the

12  Court to decide. *See Sheldon Appel*, 765 P.2d at 499; *see also Magnetar Techs. Corp. v. Intamin,*

13  *Ltd.*, 801 F.3d 1150, 1155–56 (9th Cir. 2015) ("Whether probable cause exists in a malicious

14  prosecution case is a legal question resolved by the court."). The Court explained:

15          In resolving that issue, the first question is what Detective Losey
            knew at the time he allegedly caused the charges to be filed against
16          Mr. Zoellner. If there is a dispute as to what he knew, the jury
            resolves those disputes of fact. Once those facts are established, the
17          Court decides whether they constitute probable cause. *See Est. of
            Tucker ex rel. Tucker v. Interscope Recs., Inc.*, 515 F.3d 1019, 1031
18          (9th Cir. 2008).

19  (Dkt. No. 306 at 3.) The Court advised the parties that it would decide the probable cause

20  question based only on the evidence admitted at trial (*id.* at 3–4), after the jury rendered its verdict

21  on the other malicious prosecution elements (Dkt. No. 337).

22       The case proceeded to jury trial on October 3, 2022. Before the parties rested, the Court

23  directed the parties to identify any disputed issues of fact relevant to probable cause that the jury

24  should decide. (Dkt. No. 362.) No party proposed any fact questions for the jury; accordingly, the

25  jury was not instructed to decide any specific disputes of fact. (*See* Dkt. No. 366 (Plaintiff's brief

26  noting that relevant facts are undisputed).) The Court instructed the jury that to establish his

27  malicious prosecution claim, Mr. Zoellner must prove all of the following by a preponderance of

28  the evidence:

United States District Court
Northern District of California

2

1     1. That Mr. Losey was actively involved in causing Mr. Zoellner to be prosecuted or

2          in causing the continuation of the prosecution;

3     2. That the criminal proceeding ended in Mr. Zoellner's favor;

4     3. That no reasonable person in Mr. Losey's circumstances would have believed that

5          there were grounds for causing Mr. Zoellner to be prosecuted;

6     4. That Mr. Losey acted with malice;

7     5. That Mr. Zoellner was harmed; and

8     6. That Mr. Losey's conduct was a substantial factor in causing Mr. Zoellner's harm.

9 (Dkt. No. 370 at 12.)  The instruction advised the jury that element 2 is met as a matter of law and

10 does not require any proof.  (*Id.*)  The instruction advised further that "[t]he law requires that the

11 trial judge, rather than the jury, decide if Mr. Zoellner has proven element 3 above, whether a

12 reasonable person in Mr. Losey's circumstances would have believed that there were grounds for

13 causing Mr. Zoellner to be prosecuted."  (*Id.*)  The jury rendered a verdict in Mr. Zoellner's favor

14 on those elements it was asked to decide and awarded damages on October 12, 2022.  (Dkt. No.

15 376.)  The jury then heard evidence and argument on punitive damages and awarded punitive

16 damages the same day.  (Dkt. No. 377.)

17       Thus, the Court must now decide whether Mr. Zoellner has met his burden on element 3,

18 lack of probable cause.

19 **II.    Lack of Probable Cause Element**

20       Mr. Zoellner must prove that no reasonable officer in Mr. Losey's circumstances would

21 have believed there was probable cause that Mr. Zoellner had stabbed Mr. Lawson.

22          Whereas the element of malice focuses on the defendant's state of

23          mind at the time he initiated the underlying litigation, probable cause: "is measured by the state of the defendant's *knowledge*, not by his

24          *intent*. [T]he standard applied to defendant's consciousness is external to it. The question is not whether *he* thought the facts to constitute

25          probable cause, but whether *the court* thinks they did."

26 *Tucker*, 515 F.3d at 1031 (quoting, with original emphasis, *Sheldon Appel*, 765 P.2d at 508); *see*

27 *also Radocchia v. City of Los Angeles*, 479 F. App'x 44, 45 (9th Cir. 2012) ("probable cause to

28 prosecute is . . . objective").  To put it another way, the question of probable cause is whether it

United States District Court
Northern District of California

3

1    was objectively reasonable for an officer in Mr. Losey's circumstances to believe Mr. Zoellner had

2    stabbed Mr. Lawson.  *See Conrad v. United States*, 447 F.3d 760, 768 (9th Cir. 2006) ("When the

3    claim of malicious prosecution is based upon the initiation of a criminal prosecution, the question

4    of probable cause is whether it was objectively reasonable for the defendant to suspect the plaintiff

5    had committed a crime." (cleaned up)).

6         "Probable cause exists when, under the totality of the circumstances known to the

7    [defendant,] a prudent person would have concluded that there was a fair probability that [the

8    plaintiff] had committed a crime."  *United States v. Buckner,* 179 F.3d 834, 837 (9th Cir. 1999)

9    (cleaned up); *see also United States v. Rosenow*, __ F.4th__, 2022 WL 4817585 (9th Cir. Oct. 3,

10   2022) (holding, in search warrant context, that probable cause is "a fair probability that evidence

11   of a crime may be found").  Probable cause does not require a belief "to an absolute certainty, or

12   by clear and convincing evidence, or even by a preponderance of the available evidence" that Mr.

13   Zoellner committed the stabbing; instead, "what was required was a fair probability, given the

14   totality of the circumstances."  *United States v. Lopez*, 482 F.3d 1067, 1078 (9th Cir. 2007).

15   Probable cause "requires only a probability or substantial chance of criminal activity, not an actual

16   showing of such activity."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (cleaned

17   up).  "Probable cause is not a high bar."  *Id*. (cleaned up).

18   **III.   The Record Demonstrates Probable Cause**

19        The trial record is undisputed that Mr. Losey was aware of the following facts before the

20   preliminary hearing began.

21        In the early morning hours of April 15, 2017, the police received a call regarding a

22   stabbing at a party at 1120 Spear Avenue in Arcata, California.  Arcata Police Officer Nilsen

23   arrived at the scene within a minute of having received the call from dispatch.  The cul-de-sac

24   outside the house where the party took place was dark; without any street lights, the only light

25   came from houses.  When Officer Nilsen arrived at the scene, witnesses immediately pointed to

26   where Mr. Zoellner was standing on or near the cul-de-sac.  Officer Nilsen handcuffed him and

27   put him in the back of the police car.  Mr. Zoellner did not protest or in any way resist.

28        Shortly thereafter, and within minutes of Officer Nilsen's arrival, witness Paris Wright

United States District Court
Northern District of California

4

spoke to Officer Nilsen. Mr. Wright was audio and video recorded by Officer Nilsen's MAV ("mobile audio video," *see* Dkt. No. 233 at 2). Mr. Wright stated that he had seen Mr. Lawson walking down Spear and told Mr. Lawson to "chill." At that time Mr. Lawson was not stabbed. Mr. Wright next heard a scream, and he returned toward the house and observed Mr. Lawson and Mr. Zoellner in a physical fight in a grassy area. Mr. Lawson was on the ground, with his back to the ground, and Mr. Zoellner was directly on top of him with his back to Mr. Lawson. Mr. Lawson had one arm around Mr. Zoellner's neck and a second arm holding Mr. Zoellner's arms. Mr. Wright said he separated Mr. Zoellner and Mr. Lawson and immediately saw that Mr. Lawson had been stabbed on his chest. No one else was near Mr. Zoellner and Mr. Lawson. Mr. Wright stated that he was fearful that Mr. Zoellner would stab him, so he started fighting with Mr. Zoellner. Mr. Wright disclosed he did not see Mr. Zoellner with a knife, but did see him with keys. Indeed, the recording reflects that when Officer Nilsen suggested that Mr. Zoellner had a knife, Mr. Wright corrected him and reiterated that he did not see a knife. The recording also shows Mr. Wright trying to calm people down and attempting to stop an angry party attendee from opening the police car door to reach Mr. Zoellner.

Mr. Wright's MAV recorded statement was consistent with his recorded interview given two days later. And his statement that he fought with Mr. Zoellner was corroborated by Keaundrey Clark and Elijah Chandler, two witnesses interviewed a few days after the stabbing.

Several witnesses reported observing Mr. Zoellner physically fight with Mr. Lawson outside 1120 Spear at around the time the stabbing occurred. Mr. Zoellner was the only person any witness identified as having fought with Mr. Lawson that night.

The MAV video shows Mr. Zoellner being walked to the police car, and shows that his gray sweatpants are covered in blood. While in the police car, Mr. Zoellner told Officer Nilsen that he drove alone to 1120 Spear to pick up his girlfriend from the party, and that her cell phone had been stolen. Mr. Zoellner parked his car on the cul-de-sac where 1120 Spear was located. His girlfriend and her friends met him at the car. He then proceeded to walk to the house at 1120 Spear to inquire about the stolen phone. Shortly after he arrived at the doorstep, he got into the physical altercation with Mr. Lawson.

United States District Court
Northern District of California

Later examination showed that the front and back of Mr. Zoellner's gray sweatpants had large soaked-through blood stains consistent with transference, that is, blood that had been transferred from another source to Mr. Zoellner's pants. His black hoodie also had blood on the front and back. He was wearing a white t-shirt under the hoodie, which had large splotches of blood on the front and two small spots of blood on the back, all of which were consistent with blood soaking through the hoodie. The blood on Mr. Zoellner's clothes was not consistent with his own injuries, mostly to his head, sustained in the physical altercation.

A kitchen knife was found under a red Mustang parked near 1120 Spear on the cul-de-sac. The knife was longer than the depth of Mr. Lawson's stab wounds, and therefore it was possible that the knife had caused the wounds. It is unusual for stabbings outside to be perpetrated with a kitchen knife. Mr. Zoellner was a chef and he had a personal chef's bag in his car which contained knives, although there was no evidence connecting the knife found under the red Mustang to Mr. Zoellner.

## A.    The Evidence Establishes a Fair Probability Mr. Zoellner Stabbed Mr. Lawson

A reasonable officer with Mr. Losey's knowledge would believe there was a fair probability that Mr. Zoellner stabbed Mr. Lawson.

First, Mr. Wright's nearly contemporaneous account pointed to Mr. Zoellner as the stabber. He saw Mr. Lawson and Mr. Zoellner fighting and entangled together on the ground. When he managed to separate them, he observed that Mr. Lawson has been stabbed in the chest. No one else was there fighting with Mr. Lawson.

Second, Mr. Wright's account was objectively credible. He described what he witnessed within minutes of the incident and in detail. Although he was friends with Mr. Lawson, he did not appear to exaggerate in order to label Mr. Zoellner as the stabber. Instead, he stated that he did not see Mr. Zoellner stab Mr. Lawson and he did not see a knife. He described in detail the position he found them in, explaining that Mr. Zoellner had his back to Mr. Lawson and Mr. Lawson had one arm around both of Mr. Zoellner's arms and his other arm around Mr. Zoellner's neck. Mr. Wright's police interview a couple of days later was consistent with the report he gave at the

1    scene.  Further, his statement that he started fighting with Mr. Zoellner after seeing Mr. Lawson

2    was stabbed was corroborated by two other witnesses.

3         Third, Mr. Zoellner was the only person witnesses identified as having fought with Mr.

4    Lawson that night; indeed, several witnesses reported seeing him fight with Mr. Lawson.

5         Fourth, Mr. Zoellner, and only Mr. Zoellner, was covered in blood.  His clothes were

6    soaked with blood, so much so that it leached through his hoodie to the front of his t-shirt.  And

7    Mr. Zoellner's blood-soaked clothes were not consistent with his own injuries.  While Mr.

8    Zoellner claimed the blood on his clothes came from his bloody nose, the evidence is that the

9    officers believed that the amount of blood on Mr. Zoellner's clothes, and its pattern, were

10    inconsistent with a bloody nose and the other injuries suffered by Mr. Zoellner.  No evidence

11    offered at trial contradicted the reasonableness of that belief.[1]  The officers' belief is especially

12    reasonable given that the blood stains on the *back* of Mr. Zoellner's pants and hoodie are

13    consistent with Mr. Zoellner having been entangled and fighting with a stabbed Mr. Lawson,

14    rather than his bloody nose in some unexplained way causing the back of his clothes to become

15    blood-soaked.

16         Fifth, a kitchen knife suspected to be the murder weapon was found under a car on the cul-

17    de-sac near 1120 Spear.  In the officers' experience it is unusual to have a stabbing outside a house

18    with a kitchen knife.  While the knife had not been connected to Mr. Zoellner, he was a chef with

19    access to many knives.

20         Sixth, Mr. Zoellner had a motive to stab Mr. Lawson.  Indeed, according to Mr. Zoellner,

21    Mr. Lawson "sucker punched" him when Mr. Zoellner went to the door to inquire about the stolen

22    cell phone.  Witnesses then observed Mr. Zoellner and Mr. Lawson fighting.  No other person

23    with a motive to stab Mr. Lawson was identified.  Mr. Zoellner's speculation at trial that Mr.

24

25    ---

[1] At trial Mr. Zoellner testified that his bloody nose caused the blood stains on his pants from his
26    laying in a fetal position in the police car after being placed there by Officer Nilsen.  But Officer
     Nilsen testified that there was already blood on Mr. Zoellner's clothes before he placed Mr.
27    Zoellner in the police car.  And the MAV video confirms Officer Nilsen's impression was
     objectively reasonable because it shows a large amount of blood on the front of Mr. Zoellner's
28    pants before he got into the police car.

Wright or Mr. Chandler could have stabbed Mr. Lawson is pure speculation unsupported by any evidence and, in any event, Mr. Zoellner did not identify any possible motive.

### B.    Mr. Zoellner's Cited Evidence Does Not Refute Probable Cause

Mr. Zoellner first claims that the forensic evidence "excluded" him as a suspect. (Dkt. No. 381 at 8.)  Not so.  Given the short time frame before the preliminary hearing, no testing of the blood on his clothes had been completed.  In light of the consistent witness statements that Mr. Zoellner fought with Mr. Lawson, the large amount of blood on Mr. Zoellner and its pattern not being consistent with his injuries, and Mr. Wright's detailed statement of Mr. Zoellner entangled with Mr. Lawson, a reasonable officer with Mr. Losey's knowledge could believe that the soaked-through blood on Mr. Zoellner came from Mr. Lawson.  No forensic evidence disputed that inference and Mr. Zoellner does not identify any evidence known to Mr. Losey that suggests otherwise.

That no usable fingerprint was found on the knife suspected to be the murder weapon does not "exclude" Mr. Zoellner as a suspect.  A fingerprint did not connect him to the knife, but the lack of a fingerprint did not exclude him.  Similarly, that there was no evidence connecting Mr. Zoellner to the knife believed to be the murder weapon may mean that it would be difficult to prove beyond a reasonable doubt, or by clear and convincing evidence, that he stabbed Mr. Lawson; it does not mean there was not a fair probability, a substantial chance, he stabbed Mr. Lawson in light of all the other evidence.  "For information to amount to probable cause, it does not have to be conclusive of guilt, and it does not have to exclude the possibility of innocence." *Garcia v. County of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011).

Next, Mr. Zoellner contends that probable cause was lacking because he did not have a knife.  (Dkt. No. 381 at 9.)  Again, not so.  Mr. Losey knew that no one saw Mr. Zoellner with a knife or stated that he had a knife, but that is not the same as Mr. Losey knowing that Mr. Zoellner did not have a knife.  Mr. Zoellner was not searched before he encountered Mr. Lawson; he did not go through a metal detector.  Mr. Losey did not have knowledge suggesting Mr. Zoellner could *not* have had a knife in a pocket of his clothes; instead, a reasonable officer in Mr. Losey's position would have believed that Mr. Zoellner *could have had* a knife.

1   Mr. Zoellner also contends that a reasonable officer could not have relied on Mr. Wright's

2   account to believe there was a fair probability that Mr. Zoellner stabbed Mr. Lawson.  He insists

3   that the stabbing occurred in the cul-de-sac rather than the grassy area where Mr. Wright said he

4   separated Mr. Lawson and Mr. Zoellner and therefore Mr. Wright could not reasonably be

5   believed.  As support for this "fact" as to where the stabbing occurred, he correctly notes that no

6   officer observed any blood in the grassy area where Mr. Wright reported he pulled Mr. Lawson

7   and Mr. Zoellner apart and saw that Mr. Lawson had been stabbed.  From this lack of observed

8   blood Mr. Zoellner argues that the stabbing could not have occurred in the grassy area.  But he

9   does not identify any evidence about the nature of the stab wounds that dictates that blood must

10  have been found in the grassy area for the stabbing to have occurred there.  Nor does he explain

11  why there must have been blood in the grass if that is where Mr. Lawson was stabbed given that

12  Mr. Wright found Mr. Lawson on his back and he was stabbed on his chest; thus, the stab wounds

13  were not facing the grass.  Further, the evidence that Mr. Zoellner was on top of Mr. Lawson,

14  entangled with him, and Mr. Zoellner's clothes were soaked with blood suggests any blood might

15  have transferred from Mr. Lawson to Mr. Zoellner's clothes.  In any event, there is no evidence

16  that the stab wounds would have been expected to bleed into the grass during the time Mr. Lawson

17  was lying on his back, let alone evidence that Mr. Losey must have known so.

18      Mr. Zoellner's insistence that Mr. Wright's account is "unreliable and very questionable"

19  because no blood was found on the back of Mr. Zoellner's white t-shirt (Dkt. No. 381 at 14)

20  actually highlights the existence of probable cause.  Putting aside that there were two small dots of

21  blood on the back of Mr. Zoellner's t-shirt, Mr. Zoellner ignores that there was a large amount of

22  blood on the back of his hoodie; the presence of blood on the back of his hoodie is consistent with

23  Mr. Wright's description of Mr. Zoellner having his back to Mr. Lawson's chest when Mr. Wright

24  separated them and saw that Mr. Lawson had been stabbed in the chest.  Significantly, Mr.

25  Zoellner offers no explanation for the blood on the back of his hoodie or the back of his pants.  A

26  reasonable officer in Mr. Losey's circumstances could have believed it came from Mr. Lawson,

27  consistent with Mr. Wright's description.

28      Mr. Zoellner also emphasizes that Officer Arminio's police report says the stabbing

United States District Court
Northern District of California

1    occurred in the cul-de-sac where the large pool of blood was found.  True.[2]  Indeed, Mr. Losey

2    initially believed that is where the stabbing occurred.  But Officer Arminio did not observe the

3    stabbing and Mr. Zoellner does not identify any evidence as to why Officer Arminio believed the

4    stabbing occurred there.  Nor does he identify any evidence that suggests at the time she wrote her

5    report she was aware of other evidence, including Mr. Wright's account, Mr. Zoellner's fight with

6    Mr. Lawson, and Mr. Zoellner's blood-soaked clothes.  Her report does not refute the fair

7    probability that Mr. Zoellner stabbed Mr. Lawson.

8            Mr. Zoellner relies heavily on Jason Martinez's witness statement made two days after the

9    incident.  Mr. Martinez's account—seeing someone stab another person with his right hand, and

10   then watching the stabbed person run and fall in the bushes—was consistent with the blood stain

11   in the cul-de-sac and with the location where Mr. Lawson was found and tended to by paramedics.

12   But a reasonable officer in Mr. Losey's position was not required to believe Mr. Martinez over

13   Mr. Wright's contemporaneous and detailed account; a reasonable officer could have credited Mr.

14   Wright's account over Mr. Martinez's.  Mr. Martinez's interview was two days after the incident.

15   At the time of the stabbing it was dark and there was no lighting on the street, and Mr. Martinez

16   had been at a party where many attendees were drinking.  Mr. Martinez could have been aware of

17   the blood in the cul-de-sac, as well as aware of where Mr. Lawson was found, and therefore

18   thought he had seen the stabbing as he described.  That witnesses have inconsistent recollections

19   of events does not mean there is not probable cause.

20           Finally, in his written probable cause submission, Mr. Zoellner insists that the evidence

21   points to suspects other than himself and, in particular, he contends that Mr. Lawson's girlfriend,

22   Ren Bobadilla, was injured by the knife believed to be the murder weapon.  (Dkt. No. 381 at 15

23   ("[o]ne of them was injured by that knife").)  On the trial record, that statement is false.  There is

24   no evidence that anyone other than Mr. Lawson was injured by a knife at the party on April 15,

25   2017, let alone the knife thought to be the murder weapon.  The only evidence at trial was that Ms.

26   Bobadilla had a puncture wound that was *not* consistent with a wound caused by the knife found at

27   _____

28   [2] There was testimony about Officer Arminio's report, but Mr. Zoellner did not offer it into
     evidence.

United States District Court
Northern District of California

the scene.  (Tr. 547:10-548:17.)

## IV.    Judicial Notice

Mr. Zoellner asks the Court to take judicial notice of the state court judge's lack of probable cause finding following the preliminary hearing.  The Court does so.  But it does not change the Court's analysis.  The question before this Court is not whether the district attorney satisfied its burden to prove probable cause to the state court judge based on the witness testimony and exhibits the district attorney chose to offer.  The question here is different: whether a reasonable officer in Mr. Losey's circumstances would have believed there was a fair probability that Mr. Zoellner stabbed Mr. Lawson.  Based on the evidence admitted at trial before this Court, there was such a fair probability.

* * *

Mr. Zoellner bears the burden of proving by a preponderance of the evidence that no reasonable officer with Mr. Losey's knowledge would have believed there was a fair probability that Mr. Zoellner stabbed Mr. Lawson.  Mr. Zoellner has not met that burden.  A reasonable officer could believe there was a fair probability Mr. Zoellner stabbed Mr. Lawson based on the undisputed evidence at trial indicating that Mr. Losey knew Mr. Zoellner was the only person present with a motive to stab Mr. Lawson, he was the only person seen fighting with and thus having the opportunity to stab Mr. Lawson, and he was the only person with blood-soaked clothes. Further, the identification of Mr. Zoellner as the stabber was corroborated by Mr. Wright's credible and nearly-contemporaneous observations.  The evidence emphasized by Mr. Zoellner may have made it difficult to prove his conduct beyond a reasonable doubt, but it does not defeat the much lower standard of probable cause.

## CONCLUSION

As Mr. Zoellner has not satisfied the lack of probable cause element of his malicious prosecution claim, the claim fails and judgment must be entered in Mr. Losey's favor.

The Court will hold a further case management conference on November 17, 2022 at 1:30 p.m. via Zoom video.  An updated joint case management conference statement is due seven days in advance.  The statement should address whether separate judgment should be issued on the

11

malicious prosecution claim (along with the claims disposed of on summary judgment) pursuant to Federal Rule of Civil Procedure 54(b), as well as propose next steps with respect to the bifurcated claim.

     **IT IS SO ORDERED.**

Dated: October 17, 2022



JACQUELINE SCOTT CORLEY
United States District Judge